ROBERT VEATH, Plaintiff-Appellant, v. SPECIALTY GRAINS, INC., Defendant-Appellee.

Fifth District   No. 5—88—0417

Opinion filed October 10, 1989.—Rehearing denied November 14, 1989.

788

Terry Sharp, of Law Offices of Terry Sharp, P.C., of Mt. Vernon, for appellant.

Thomas H. Jones, of Wolff & Jones, of Murphysboro, for appellee.

JUSTICE CHAPMAN delivered the opinion of the court:

This appeal was brought by the plaintiff, Robert Veath, to contest the trial court's finding that plaintiff take nothing by his suit for breach of contract to which the plaintiff and defendant were parties.

On February 20, 1984, Robert Veath and Specialty Grains, Inc., entered into a written premium corn production contract whereby plaintiff agreed to plant no less than 200 acres of premium corn and to grow not less than 15,000 bushels of white waxy premium corn. Specialty Grains agreed to purchase all such bushels that plaintiff produced. It is plaintiff's contention that defendant is obligated under the contract to pay plaintiff for all corn delivered and accepted onto defendant's barge in an amount compensating plaintiff for the value of U.S. grade No. 2 quality corn. Plaintiff further contends that defendant is entitled to no recovery of loss as to the grain neither accepted nor delivered.

The contract provided that upon request by Specialty Grains, plaintiff was to deliver the shelled premium corn to the Bunge elevator at Grand Tower, Illinois, during dates and times specified by Specialty Grains. The agreement between the parties provided that "all grain delivered to SGI by Grower shall grade U.S. No.2 white corn."

During the bench trial in this cause, plaintiff testified that in 1984 he planted approximately 200 acres of white waxy corn pursuant to the terms of the premium corn production contract. Plaintiff completed harvesting the crop in January 1985. Plaintiff testified that in February 1985 Specialty Grains' agent Robert Trewaethe visited his farm and took grain samples from each of the four bins where the harvested crop was stored. Neither Specialty Grains nor Mr. Trewaethe advised the plaintiff of the results of the February 1985 grain sampling test.

Plaintiff further testified that on May 23 or 24, Robert Trewaethe of Specialty Grains once again visited the farm to gather grain samplings from the bins and advised the plaintiff that the quality of the grain did not appear to be good. Plaintiff, however, testified that at that time Specialty Grains did not contact him to advise him that the quality of the grain was not satisfactory.

On May 29, 1985, plaintiff delivered four trailer loads of the grain to the Bunge Corporation elevator at Grand Tower, Illinois. There Robert Trewaethe conducted a grain sampling test on the loads. Plaintiff described that sampling technique to the court. He stated that Mr. Trewaethe took a 15- to 20-foot brass probe and probed into

the loads of grain. The grain which was probed was then put into a container and taken to the scale house, where it was tested to determine weight and moisture content. After inspection, plaintiff testified, Robert Trewaethe told him the grain was acceptable and that plaintiff should dump it. Plaintiff dumped the four loads. He observed the grain being loaded on a barge from a belt conveyor. Plaintiff then returned home to gather the other loads for hauling to the elevator. Altogether plaintiff delivered seven loads on May 29 and eight loads on May 30. Plaintiff testified that no one contacted him on May 29 with regard to the grain he delivered. On May 30 Robert Trewaethe telephoned plaintiff and told him that five of the eight loads delivered that day were rejected because the grain had "too high of a damage." Of those five loads, two were taken to an elevator at Con Agra, which agreed to purchase them. The other three loads were returned to plaintiff's farm.

Marvin Campbell testified on behalf of the plaintiff. Mr. Campbell assisted plaintiff in hauling his grain to the Bunge elevator on May 29 and 30. He testified that he personally observed Mr. Trewaethe conduct the grain sampling of two loads of plaintiff's grain which were rejected at the elevator. Mr. Campbell stated that Mr. Trewaethe told him at that time that the two loads would not be accepted because they were beyond the grade standards which they wished to put on the barge. Mr. Trewaethe did not explain what that grade standard was.

Mr. Campbell and the plaintiff both testified at trial as to their observation of the Specialty Grains agent Robert Trewaethe rejecting a farmer's grain at the Bunge elevator on May 29. Both Campbell and the plaintiff testified that when the corn of Mr. Van Endres was tested by Robert Trewaethe, Mr. Trewaethe telephoned someone and advised the party to whom he was speaking that the corn would not grade. Mr. Trewaethe then told Van Endres to move his truck out of line and not to dump the grain.

Marvin Campbell testified that he has been co-owner of Campbell Grain Company since its inception in 1979. He stated that during his employment at Campbell Grain, he did most of the grading during the harvest periods. He estimated that he has graded thousands of samples. Mr. Campbell testified that during his years at Campbell Grain, he has never attempted to reject a load of grain after it was dumped at his facility. On cross-examination Mr. Campbell acknowledged that he has not had experience with the grading of white waxy corn.

Richard Berlin, controller for Specialty Grains, was called as an adverse witness by the plaintiff. It was Mr. Berlin who sent a letter

to Mr. Veath, dated June 14, 1985, describing the calculations as to the losses incurred by Specialty Grains and how Specialty Grains calculated the final amount due plaintiff under the contract. That letter showed the total loss to Specialty Grains to be deducted from plaintiff's final payment to be $17,115.16. Mr. Berlin testified that the 10 loads of grain which were dumped at the Bunge elevator on May 29 and 30 were not "accepted" by Specialty Grains, but were dumped to the account of Mr. Veath.

Mr. Berlin explained to the court that in preparing the settlement statement which shows what losses Specialty Grains incurred and what payment was due the plaintiff, he first reviewed the weight tickets from Grand Tower. The weight tickets establish the weight of the grain delivered to the elevator. Berlin testified that final settlement was not calculated until grade certificates or a report of grade was received from the Cairo Grain Inspection Agency. In determining the final settlement figures, Mr. Berlin testified that he also waited to see whether the grain loaded on the barge at Grand Tower was accepted by Specialty Grains' customer and what price Specialty Grains would receive for that grain.

Mr. Berlin outlined at trial how he calculated the amount owed to Veath under the terms of the contract. The settlement statement, attached to his letter of June 14, is comprised of three parts. Mr. Berlin explained that part 1 represents the actual saleable value of the corn accepted by Specialty Grains at Bunge and what would have been received if the corn had been of U.S. No. 2 grade. The second section of the settlement sheet refers to the two loads of grain which were sold at the Con Agra elevator. Calculations are made as to the difference between the price received for those loads compared to the value of what the loads would have been worth had they been of U.S. No. 2 grade. Section 3 of the settlement statement details the difference between what Specialty Grains would have received had Veath delivered the 14,500 bushels that were estimated would be produced instead of 11,494.76 bushels of corn actually delivered to the Bunge elevator.

We note that Robert Trewaethe was not called as a witness at trial; however, defendant did call Mr. John Trewaethe, a procurement manager for Specialty Grains, to testify. He explained that as outlined by the Federal grain standards, there are limitations for moisture, damage for material, test weight and other factors which are figured to determine grades of corn. Five percent damage is the maximum allowable limit for U.S. grade No. 2. He explained that corn grading more damage than 5% would receive a lower grade

standard, such as No. 3 grade or No. 4 grade, or even sample grade, which is the lowest grade.

John Trewaethe testified that in the normal course of delivery, grain samples on each truckload of grain are obtained. Composite samples are taken at the site of delivery, and the actual grading procedure is done by a licensed State inspector. Trewaethe advised the court that the tests performed by that licensed State inspector are binding on both Specialty Grains and the grower. Exhibits admitted at trial included the grain certificates received from the Cairo Grain Inspection Agency. Those identified plaintiff's grain samples as either U.S. grade No. 5 white corn or sample grade white corn.

After considering the evidence and arguments of counsel, the court entered judgment in favor of the defendant. The court's written judgment included a finding that although plaintiff proved that he had planted and grown approximately 200 acres of white waxy corn and delivered 14,164.78 bushels of white waxy corn to the Bunge elevator, plaintiff failed to prove that the corn was U.S. grade No. 2 quality. The court found that defendant accepted 9,485.13 bushels onto the barge at Grand Tower. This corn later proved to be U.S. grade No. 5. Specialty Grains rejected 4,679.65 bushels of plaintiff's white corn at Grand Tower. Of the rejected bushels, 1,954.64 bushels were sold to Con Agra, and 2,720 bushels of white corn were returned to plaintiff's farm.

The court further held that the contract between the parties gave defendant the right to reject corn that did not meet purity and grading standards of No. 2 grade white waxy corn. The contract further provided a method of pricing all corn accepted by Specialty Grains which did not meet grading factors. The court found that the contract did not excuse the plaintiff from delivering corn which was damaged beyond the requisites of U.S. grade No. 2, and that defendant's acceptance of the corn did not waive plaintiff's obligation to provide U.S. grade No. 2 corn. The court further held that under the contract defendant was required to pay the price per bushel of the corn accepted under the terms of the contract and that defendant was not entitled to damages for loss of profit on the difference between the number of bushels the parties estimated would be delivered under the contract and the number of bushels actually delivered. However, defendant would be entitled to its loss of expected profit on grain actually delivered to the Bunge elevator. In summary, the court determined that plaintiff was not entitled to recovery for breach of contract.

OPINION

█ Plaintiff first challenges on appeal the trial court's finding that defendant did not breach the contract. Although the parties briefly note some provisions of the Uniform Commercial Code, we note provisions of the Code (Ill. Rev. Stat. 1987, ch. 26, par. 1—101 *et seq.*) which are applicable to the case at bar and to which the parties did not refer. It is plaintiff's contention that defendant accepted the grain loaded onto the barge at the Bunge elevator as being in conformance with grade standards of U.S. No. 2 quality. Plaintiff argues that the contract did not reserve to defendant the right to revoke acceptance of the grain after it had accepted the grain as U.S. grade No. 2 quality at the Bunge elevator. We first address the issue of whether Specialty Grains accepted the grain at Grand Tower. The buyer upon improper tender may accept all the goods, reject all the goods, or accept part and reject part. (Ill. Rev. Stat. 1987, ch. 26, par. 2—601.) Once the goods are accepted, however, the buyer must pay for them at the contract rate unless acceptance is revoked. (Ill. Rev. Stat. 1987, ch. 26, par. 2—607.) Acts which constitute acceptance of goods are delineated in section 2—606 of the Uniform Commercial Code:

"§2—606. What Constitutes Acceptance of Goods. (1) Acceptance of goods occurs when the buyer

(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or

(b) fails to make an effective rejection (subsection (1) of Section 2—602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

(2) Acceptance of a part of any commercial unit is acceptance of that entire unit." Ill. Rev. Stat. 1987, ch. 26, par. 2—606.

█ Defendant, in its pretrial answers to interrogatories, stated in response to the question whether plaintiff's grain was graded or tested at Grand Tower, that no official grade was performed at the site. Defendant has consistently maintained that no loads of grain were either accepted or rejected at Grand Tower. Defendant contends those loads not directed to be dumped for loading on the barge

were rerouted to either the Con Agra elevator or back to plaintiff's farm. We disagree with defendant's contention that the grain loaded to the barge was not accepted by Specialty Grains. The grain was inspected by Robert Trewaethe at Mr. Veath's farm twice before delivery to the barge. At the second inspection, which took place five or six days prior to delivery, Mr. Trewaethe advised Mr. Veath that the grain did not appear to be good. At no time, however, did Mr. Trewaethe suggest that Specialty Grains was rejecting the corn. In addition, in sampling and testing the grain at the point of delivery, expressly rejecting various loads of grain, instructing plaintiff that 10 of his loads of grain were acceptable and that he should dump them for conveyance to the barge, and commingling plaintiff's grain with other grain, Specialty Grains demonstrated acceptance of the 10 loads of grain as to each of the three methods set forth in section 2—606 of the Uniform Commercial Code.

■ With regard to the three loads which were sent back to the farm, and the two loads routed to Con Agra, Specialty Grains rejected those loads in conformance with rightful rejection under section 2—602 of the Uniform Commercial Code. (Ill. Rev. Stat. 1987, ch. 26, par. 2—602.) Specialty Grains' refusal to load the five loads onto the barge at the Bunge elevator, and Specialty Grains' telephone conversation with the plaintiff advising him that the five loads were not acceptable, are actions consistent with rightful rejection under section 2—602.

■ Having established that the 10 loads of grain dumped for conveyance to the barge were accepted by Specialty Grains, we next consider plaintiff's argument that the grain was accepted as grade No. 2 quality, and was not accepted with the reserved right of subsequent inspection to determine the quality and commensurate lower price to be paid to plaintiff. We find no need to address the question whether defendant had the right to revoke acceptance, since we agree with the plaintiff that assuming defendant had the right to revoke acceptance, defendant did not exercise such right in accordance with the Uniform Commercial Code. A reviewing court will not consider questions or contentions which are not essential to the determination of the case before it. *Wilson v. Illinois Benedictine College* (1983), 112 Ill. App. 3d 932, 936, 445 N.E.2d 901, 905; *Yale Development Co. v. Andermann* (1976), 37 Ill. App. 3d 33, 39, 344 N.E.2d 701, 707, citing *Navickas v. Lawrence Hall, Inc.* (1967), 85 Ill. App. 2d 43, 49, 228 N.E.2d 234, 238.

■ ■ Plaintiff contends that assuming defendant had the right to revoke acceptance of the 10 loads of grain, defendant did not re-

voke acceptance of the corn within a reasonable time. Plaintiff argues that defendant's conduct was unreasonable because defendant did conduct sampling tests and rejected some of plaintiff's grain at the point of delivery, while making no indication to plaintiff that the grain loaded onto the barge was below No. 2 grade. Plaintiff contends that it wasn't until two weeks later that he was notified the grain was below grade.

The Uniform Commercial Code provides that an action is to be judged as reasonable depending on the nature, purpose and circumstances of such action (Ill. Rev. Stat. 1987, ch. 26, par. 1—204(2)), and in each case that finding rests with the trier of fact. (*Heller v. Sullivan* (1978), 57 Ill. App. 3d 190, 372 N.E.2d 1036.) In conformity with this standard, section 2—608(2) provides in pertinent part:

> "Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it." (Ill. Rev. Stat. 1987, ch. 26, par. 2—608(2).)

In the instant case the Cairo Grain inspection certificates which were admitted into evidence at trial show that inspection of the samplings of grain loaded on the barge were conducted May 31, 1985. Defendant at oral argument in this cause acknowledged that these certificates are issued two to three days after the grain is dumped. Defendant's witness testified that this period of delay is customary in the trade since the official grain inspector is not present at the site of delivery. The defendant's witness Mr. Berlin testified that, in calculating the final settlement due plaintiff, he used the weight tickets and the Cairo grain inspection certificates. He testified that, before making the final determination as to the amount due plaintiff, he waited to see whether the grain was accepted by Specialty Grains' customer and what price Specialty Grains would receive for that grain. We believe the testimony in this case that defendant failed to notify plaintiff of its revocation of acceptance of the grain promptly after the grain inspection certificates were received amply supported the trial court's finding that defendant did not revoke acceptance. This conclusion is premised on the fact that the trial court could reasonably have inferred from the facts that the transaction had reached a stage beyond the time for revocation of acceptance. We see no reason to dispute the trial judge's conclusion. We note that the court of review will not disturb the findings of the trial judge sitting without a jury if there is any evidence in the record to support

those findings. (*Cotter v. Parrish* (1988), 166 Ill. App. 3d 836, 842, 520 N.E.2d 1172, 1176.) In a bench trial the findings of fact by the trial judge are to be afforded the same deference as those of a jury. *Watkins v. Martin* (1983), 115 Ill. App. 3d 417, 422, 450 N.E.2d 866, 870.

Since it accepted the grain loaded onto the barge and did not revoke acceptance within a reasonable time, defendant is not entitled to deduct $12,596.83. It is, however, entitled, according to the contract, to take a 3 cent discount per bushel. Therefore, as to the $12,596.83, defendant is entitled to keep $284.55 from the proceeds paid to plaintiff. Specialty Grains' settlement statement showed $12,596.83 as being the loss Specialty Grains incurred on the 9,485.13 bushels accepted at Grand Tower. This amount represented the difference between the saleable value of the corn accepted by Specialty Grains and what Specialty Grains would have received had the corn been of No. 2 grade. We find that this measure of damages was improperly deducted from plaintiff's final payment.

■ We note that the trial court found that as to the 9,485.13 bushels dumped at the Bunge elevator, plaintiff would have been entitled to the amount provided in the contract, but was not entitled to recover because plaintiff did not deliver grain of U.S. No. 2 grade.

The contract included a pricing agreement and grades and discount clause which provided in part:

"DELAYED PRICING AGREEMENT: ***

The base price quoted to the Grower on such pricing date shall be the Mar. 85 corn futures quoted at the Chicago Board of Trade during a session when such option is trading. The base price may be based upon any other option only when mutually agreed upon by Grower and SGI and reconfirmed in writing.

(55 cents premium if corn goes to Chester, IL)

A premium/basis to 60 cents shall be added to/subtracted from the base price to determine the net price. All prices quoted shall be deemed as prices for grain delivered by the Grower to the delivery point as designated in paragraph 4."

"GRADE AND DISCOUNT:

All grain delivered to SGI by Grower shall grade U.S. No.2 white corn. ***

Any quantity of corn grading below any of the aforementioned grade factors which is accepted by SGI shall be discounted on a per bushel basis using the discount scale in effect at the time of delivery."

A buyer who has accepted goods and given proper notice may recover damages for breach of contract. (Ill. Rev. Stat. 1987, ch. 26, par. 2—714(1).) These damages are subject to contractual limitation. (*J.D. Pavlak, Ltd. v. William Davies Co.* (1976), 40 Ill. App. 3d 1, 3, 351 N.E.2d 243, 245.) Section 2—719(1)(a) of the Code states that the parties may contract to "provide for remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article." (Ill. Rev. Stat. 1987, ch. 26, par. 2—719(1)(a).) Section 2—719(1)(b) states that a remedy in the contract "is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy." Ill. Rev. Stat. 1987, ch. 26, par. 2—719(1)(b).

■ Our initial inquiry is whether the contractual remedy is expressly agreed to be exclusive, as contemplated in section 2—719(1)(b). A remedy will be held to be exclusive when that is the reasonable construction of the contract despite any failure to employ the word *exclusive*. (*J.D. Pavlak*, 40 Ill. App. 3d at 3, 351 N.E.2d at 245.) In the instant case we note that the contract was prepared by Specialty Grains. The rule is well established that an instrument is to be construed most strongly against its author. (*Crest Builders, Inc. v. Willow Falls Improvement Association* (1979), 74 Ill. App. 3d 420, 423, 393 N.E.2d 107, 110, quoting *Cedar Park Cemetery Association, Inc. v. Village of Calumet Park* (1947), 398 Ill. 324, 333, 75 N.E.2d 874, 879.) In drafting the contract, Specialty Grains included a provision stating that "this agreement constitutes the entire understanding between the parties." Although the word "exclusive" was not incorporated into the agreement, to hold that the pricing, grade and discount provisions of the contract were not to be Specialty Grains' sole remedy upon acceptance of the grain would render meaningless those provisions. We conclude that the parties intended the contractual pricing formula and grade and discount mechanism for grain accepted by Specialty Grains to be the exclusive remedy. Under the contract Specialty Grains was entitled to deduct 3 cents per bushel. Since Specialty Grains accepted 10 loads or 9,485.13 bushels, it was entitled to deduct $284.55 from the proceeds due plaintiff.

■ With regard to the finding of the trial court that Specialty Grains is not entitled to loss of profit on the difference of the number of bushels estimated would be delivered in the contract, and the number of bushels actually delivered, we affirm. The contract included a *force majeure* clause, providing in part: "If either party to this agreement is unable to perform his obligation or any obligation

under this agreement, by reason of weather conditions \*\*\* then neither party shall have any liability under this agreement." The trial court found that Robert Veath was excused from delivering the total 15,000 bushels due under the contract because of weather conditions. Because we will not disturb the findings of the trial judge sitting without a jury if there is any evidence in the record to support those findings, we affirm. *Cotter v. Parrish* (1988), 166 Ill. App. 3d 836, 842, 520 N.E.2d 1172, 1176.

■■ As for the grain which was rejected by Specialty Grains and routed to Con Agra or sent back to plaintiff's farm, defendant's settlement statement provided that a loss of $4,518.33 was to be deducted from the proceeds due plaintiff by defendant. Plaintiff argues that defendant's calculation of lost profits or other consequential damages as to the grain routed to Con Agra and the grain returned to the farm is an attempt by defendant to modify the otherwise clear terms of the contract.

Once again we note that a contractual remedy will be held to be exclusive when that is the reasonable construction of the contract. (*J.D. Pavlak*, 40 Ill. App. 3d at 3, 351 N.E.2d at 245.) The contract drafted by Specialty Grains in the case at bar provides that Specialty Grains "reserves the right to reject any corn grading 'weavily', 'sour', 'musty', or otherwise not grading U.S. Grade No. 2." The contract provides that "in the event the premium corn shall be seized or condemned as adulterated food, the grower shall reimburse SGI for all loss, costs, and expenses in connection with the seizure, condemnation or contamination of the unacceptable premium corn." Any construction that the remedy provided to Specialty Grains in the event the corn was not grading U.S. grade No. 2, or was seized or condemned, was nonexclusive, and that Specialty Grains could in addition seek its remedies under the Uniform Commercial Code as to the rejected corn, would render meaningless the contract clause that "this agreement constitutes the entire understanding between the parties." We find that the contract did limit the measure of damages to Specialty Grains which would have otherwise been available under the Uniform Commercial Code. We find that Specialty Grains was not entitled to damages for the corn routed to Con Agra or returned to the farm, and thus, plaintiff is entitled to recovery in the amount of $4,518.33 which was withheld by Specialty Grains.

We are mindful of the trial court's refusal to award a monetary recovery to plaintiff. The trial court reasoned in its written judgment that it could not award monetary damages to the plaintiff since the plaintiff brought its cause of action on a breach of contract theory.

The court held that, under the terms of the contract, plaintiff was not excused from delivering corn that was of U.S. No. 2 grade. Since plaintiff failed to perform under the contract, plaintiff could not recover under a breach of contract theory. We find that the trial court erred.

■■■ If the trial court's finding that plaintiff had not fulfilled his contractual duty were true, we would be forced to deny plaintiff recovery, since as stated in *Archibald v. Board of Education* (1959), 19 Ill. App. 2d 554, 561, 154 N.E.2d 867, 870:

> "It is a fundamental principle of the law that, in order for one to recover upon a contract, he must have performed his part of the contract."

We believe the trial court misconstrued the language of the contract. The trial court found that plaintiff was not excused from delivering U.S. grade No. 2 corn, and since plaintiff did not deliver No. 2 grade, plaintiff could not seek recovery for breach of contract. Regardless of the contract provision that plaintiff was to grow and deliver 15,000 bushels of premium corn, the contract further provided that corn which did not meet the No. 2 grading standard was subject to rejection or could be accepted by Specialty Grains at a discounted rate. We note that the trial court in its order recognized that the contract provided a means of pricing corn accepted by defendant which did not meet U.S. grade No. 2. The language allowing for delivery of corn below U.S. No. 2 grade, when coupled with defendant's acceptance of the 9,485.13 bushels of grain, excused plaintiff from delivering No. 2 grade.

In summary, as to the 9,485.13 bushels accepted by Specialty Grains, plaintiff is entitled to $12,312.28. As to the grain rejected and either returned to the farm or routed to Con Agra, plaintiff is entitled to $4,518.33. Specialty Grains is entitled to keep $284.55 from the amount it withheld from Mr. Veath.

■■■ Finally we are asked by the plaintiff to add interest at the rate of 5% per annum from June 14, 1985, to the judgment entered in his favor. The law in Illinois as to when prejudgment interest can be awarded is stated in *General Dynamics Corp. v. Zion State Bank & Trust Co.* (1981), 86 Ill. 2d 135, 140, 427 N.E.2d 131, 134, quoting *Watson Lumber Co. v. Guennewig* (1967), 79 Ill. App. 2d 377, 398, 226 N.E.2d 270, 280, as follows:

> " 'Interest is not awarded on money that may be found due, if the person withholding payment has done so in good faith, because of a genuine and reasonable dispute. *** [Citation.]
>
> *** [I]t has been held error to allow interest on an amount

due when, as here, that amount depends largely upon the construction placed on the terms of a contract, and upon questions of fact about which there is room for a difference of opinion. [Citation.]' "

We hold that under the circumstances plaintiff is not entitled to prejudgment interest.

The judgment is reversed and cause remanded with instructions to the court to enter a judgment in favor of plaintiff on the complaint in the amount of $16,830.61.

Reversed and remanded.

WELCH and LEWIS, JJ., concur.