JOHN D. COTTER *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. PAUL PARRISH *et al.*, Defendants-Appellants and Cross-Appellees.

Fifth District No. 5—87—0083

Opinion filed March 4, 1988.

Thomas H. Boswell, of Mitchell, Brandon & Schmidt, of Carbondale, for appellants.

Thomas F. Crosby, of Winters, Brewster, Murphy, Crosby & Patchett, of Marion, for appellees.

JUSTICE KARNS delivered the opinion of the court:

Paul and Viola Parrish, defendants, appeal from the judgment of the circuit court of Jackson County rescinding a contract for deed in favor of plaintiffs, John D. Cotter and Steven L. Bainbridge. Plaintiffs cross-appeal the trial court's failure to order full restitution. We affirm both appeals.

Paul Parrish, a building contractor, designed and built an underground house in Carbondale, Illinois. The house was completed in late 1977 or early 1978 whereupon the Parrish family moved in and resided in the dwelling until December 1981. The house, which was completely surrounded by earth on all four sides, consisted of two bedrooms, two full baths, a kitchen, dining room, utility room, office and atrium. A detached two-story garage/barn was connected to the house by means of a 36-foot long tunnel. At the time the dwelling was built, underground houses were uncommon in the area and Mr. Parrish had had no previous experience in constructing such structures.

The Parrishes placed the house up for sale in December of 1980. Plaintiffs first viewed the house in November 1981. After several visits and one meeting with the Parrishes to discuss any problems such as cracks or leaks in the structure, plaintiffs agreed to purchase the dwelling for a sale price of $85,000. Mr. Parrish assured them the house had no problems, cracks or leaks. Plaintiffs paid $17,000 as a down payment and began making monthly installments of $821.03 under the contract for deed.

Plaintiffs moved into the structure in December of 1981. They immediately noticed a V-shaped crack in the east wall of the detached garage/barn. Plaintiffs failed to notice the crack on their prior inspections of the house because a U-Haul-type of utility trailer had been parked in front of it. Mr. Parrish testified that he had no problems with the crack once he had repaired it by digging out behind the wall and filling it all back with rock to prevent water seepage. He further testified that the trailer was some eight inches away from the wall and the plaintiffs could have seen the crack if they looked.

Plaintiffs next discovered the wood stove in the atrium would not draw smoke. Further inspection revealed that the flue pipe was in an improper configuration and was of such material that it could generate toxic gas at certain temperatures. Plaintiffs spent approximately $500 to have this defect corrected.

Within two months plaintiffs learned that the atrium leaked constantly during rains, the exhaust fan above the stove dripped water, and the tunnel from the residence to the detached garage/barn often contained water. When plaintiffs removed the exhaust fan to correct

the leak, they found a warning on it stating that it was not suitable for use over cooking implements.

By October of 1982, plaintiffs discovered leaks in the closets of the master and second bedrooms, the northwest corner of the living room and the master bedroom-bathroom. The walls in the closets began exhibiting mold and mildew, and a moldy, musty odor began to permeate the structure. When plaintiffs removed the walls they found rotted studs and "honeycombing" (fissures where concrete failed to set up) of the concrete walls. From one of these fissures, plaintiffs testified a stream of water poured through to such an extent that a 55-gallon garbage can used to catch the water had to be emptied three times a day. Plaintiffs dug up the dirt around the leaking walls and found further evidence of honeycombing. They also discovered protruding snap ties on the exterior walls. Snap ties are metal rods which are passed through freshly poured concrete to hold the concrete forms in place while the concrete sets up and are designed to be broken off and sealed up after the forms are removed. The ties were rusting and deteriorating, allowing water to migrate through the walls. An expert determined that, in addition to those structural problems, only damp-proofing as opposed to waterproofing had been applied to the exterior. In order to correct the problems, the perimeter of the house would need to be excavated down to the footing depth and the walls cleaned, all snap ties broken and patched, all honeycombed areas patched and a waterproofing membrane applied to the surface. In addition, drain tile would need to be replaced, backfilled and compacted.

Plaintiffs mailed a letter of rescission of the contract for deed to the Parrishes in June of 1983 but continued to make monthly payments to December. Mr. Cotter moved out in January 1984 and Mr. Bainbridge left in the spring. The Parrishes repossessed the abandoned house in May. According to Mr. Parrish, the house was filthy and many items were broken or missing. The Parrishes made the necessary repairs and by July of 1985 rented the house for $400 a month. The only problems the tenants experienced were dampness and mold and leaks in the tunnel.

Plaintiffs filed suit alleging breach of warranty of habitability, material misrepresentations concerning the condition of the structure, and fraudulent concealment of defects. The Parrishes filed a counterclaim for damage to the property and for back-due payments under the contract for deed. The trial court found that the Parrishes had breached the implied warranty of habitability but were entitled to a setoff for the rental value of the dwelling which accrued prior to the

notice of rescission. The court therefore awarded plaintiffs $30,460.72 ($37,667.72 paid on the contract minus $7,200 rental). The court also ruled against the Parrishes on their counterclaim. Both parties appeal the trial court's rulings.

■■ The Parrishes first argue on appeal that the trial court's finding of a breach of an implied warranty of habitability is against the manifest weight of the evidence. We disagree.

The warranty of habitability has been adopted by our courts to protect purchasers of new homes upon discovery of latent defects. (*Redarowicz v. Ohlendorf* (1982), 92 Ill. 2d 171, 183, 441 N.E.2d 324, 330.) The basis for such a warranty is that in today's society, a purchaser has a right to expect the structure he bargained for to be reasonably fit for use as a residence. (*Petersen v. Hubschman Construction Co.* (1979), 76 Ill. 2d 31, 40, 389 N.E.2d 1154, 1158.) The mere fact that the house is capable of being inhabited does not satisfy this implied warranty. (76 Ill. 2d at 41, 389 N.E.2d at 1158.) The plaintiffs in this instance were able to coexist with the defects in and problems of their house for a period of time, but surely no one would believe this is the type of house for which they bargained. The structure exhibited numerous and substantial defects, none of which were apparent on viewing the property and all of which rendered it unfit as a residence. See *Park v. Sohn* (1982), 89 Ill. 2d 453, 463-64, 433 N.E.2d 651, 656.

The Parrishes argue, however, the house was not new when plaintiffs purchased it. Therefore, they contend, no implied warranty of habitability exists under these circumstances. It is true the Parrishes lived in the house nearly four years. The house, however, was on the market for over a year of that time before the plaintiffs purchased it. More importantly, Mr. Parrish is a builder-vendor, one who is engaged in the business of building, so that his sales of residences are of a commercial nature. (*Park,* 89 Ill. 2d at 461, 433 N.E.2d at 655.) This was the fifth house Mr. Parrish had built and subsequently sold after his family occupied the dwelling for a period of time. To hold that the warranty of habitability does not exist in this instance simply because the Parrishes had lived in the structure first for a few years would provide any builder-vendor with a "simple artifice for avoiding the warranty." (89 Ill. 2d at 463, 433 N.E.2d at 656.) The builder-vendor who constructed the new house and created the latent defects should bear the responsibility, not the purchaser who relied on him. (*Redarowicz,* 92 Ill. 2d at 183, 441 N.E.2d at 330; *Park,* 89 Ill. 2d at 462, 433 N.E.2d at 656.) Whether or not a house is new for purposes of the warranty of habitability must be decided on a case-by-case basis.

(*Park,* 89 Ill. 2d at 463, 433 N.E.2d at 656.) Our supreme court already has found the warranty to be applicable in a similar situation when the builder-vendor had lived in the house for some two years prior to selling. (See 89 Ill. 2d at 463, 433 N.E.2d at 656.) We find no error in the trial court's extending the warranty to the present situation.

■ ■ The Parrishes next contend the trial court erred in granting rescission of the contract on the basis of material misrepresentations in the inducement. The trial court's determination that rescission was an appropriate remedy, however, is amply supported by the record.

The elements of fraudulent misrepresentation are (1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance. (*E.g., Munjal v. Baird & Warner, Inc.* (1985), 138 Ill. App. 3d 172, 179, 485 N.E.2d 855, 862; *Kinsey v. Scott* (1984), 124 Ill. App. 3d 329, 335, 463 N.E.2d 1359, 1364.) In addition, concealment of an existing material fact and/ or silence accompanied by deceptive conduct or suppression of material facts amounts to fraudulent misrepresentation. *Munjal,* 138 Ill. App. 3d at 180, 485 N.E.2d at 862-63; *Perlman v. Time, Inc.* (1978), 64 Ill. App. 3d 190, 195, 380 N.E.2d 1040, 1044.

Despite inquiry by plaintiffs, the Parrishes failed to disclose known structural defects in the underground dwelling. They did not inform plaintiffs of water leakage in the atrium or above the stove; nor did they reveal that the exhaust fan vent line had been capped. Instead, they told the plaintiffs that there were no leaks and that the fan vented to the outside. Mr. Parrish also represented that waterproofing had been applied to the exterior walls when, in fact, dampproofing material had been used. Lastly, the Parrishes actively concealed the only visible defect by placing a trailer in front of it. It does not matter that the trailer was parked sufficient inches away from the wall for plaintiffs to have seen the crack if they went over to the trailer and peered behind it. The Parrishes cannot claim as a defense that plaintiffs were not sufficiently careful to discover their fraud. (See *Roda v. Berko* (1948), 401 Ill. 335, 342, 81 N.E.2d 912, 916.) The Parrishes' misrepresentations and intentional nondisclosures of material information went to the very heart of the inquiries that plaintiffs made concerning the structural integrity and habitability of the underground house. The trial court's determination clearly is not against the manifest weight of the evidence. See, *e.g., Munjal,* 138 Ill. App.

3d at 179, 485 N.E.2d at 862; *Kinsey*, 124 Ill. App. 3d at 337, 463 N.E.2d at 1365.

■■ The Parrishes' final contention on appeal is that the denial of their counterclaim for damages to the premises was against the manifest weight of the evidence. The Parrishes did not establish, however, by any competent evidence that plaintiffs caused the damage or that it occurred prior to their relinquishing possession. Moreover, some of the complained-of damages clearly fall within the purview of the contract provision allowing for redecorating, alterations and improvements of the property by plaintiffs.

■■ We, sitting as a court of review, will not disturb the findings of the trial judge sitting without a jury if there is any evidence in the record to support those findings. (*E.g., Orchard Shopping Center, Inc. v. Campo* (1985), 138 Ill. App. 3d 656, 665, 485 N.E.2d 1248, 1254; *La Grange Metal Products v. Pettibone Mulliken Corp.* (1982), 106 Ill. App. 3d 1046, 1054-55, 436 N.E.2d 645, 652.) When the evidence is contradictory, it is for the trial court to resolve all conflicts and determine the credibility of the witnesses. (*Orchard Shopping Center*, 138 Ill. App. 3d at 665, 485 N.E.2d at 1254; *La Grange*, 106 Ill. App. 3d at 1055, 435 N.E.2d at 652.) We see no reason to overturn the trial court's judgment in this instance.

■■ ■ Plaintiffs cross-appeal that the trial court erred in offsetting their award with the rental value of the premises prior to their notice of rescission. The purpose of rescission is to disaffirm the transaction of the parties and restore them to the status quo as it existed prior to the execution of the contract. (*Finke v. Woodard* (1984), 122 Ill. App. 3d 911, 919, 462 N.E.2d 13, 19.) The proper measure of recovery is restitution of the consideration and other benefits received by the parties under the contract. (122 Ill. App. 3d at 919, 462 N.E.2d at 19.) Plaintiffs therefore are entitled to the return of all monies paid pursuant to the contract plus the costs incurred in correcting defective problems. (122 Ill. App. 3d at 920, 462 N.E.2d at 19.) But, in order to restore the parties to the status quo, plaintiffs are entitled only to be reimbursed the amount they paid on their contract minus any benefit they received during their occupancy of the property. Just as the Parrishes benefited from the plaintiffs' repairing of the wood stove, so did the plaintiffs benefit from residing in and having the use of the premises prior to giving notice of rescission. Moreover, while plaintiffs occupied the premises, the Parrishes were unable to use the property or rent or sell it to others. We find no error in the trial court offsetting plaintiffs' award by the rental value of the property through the date of notice of rescission. We further find that the trial

court's determination as to the amount of that value is not against the manifest weight of the evidence.

For the aforementioned reasons, we affirm the judgment of the circuit court of Jackson County in its entirety.

Affirmed.

HARRISON, P.J., and WELCH, J., concur.