FIRST DIVISION
February 27, 2006

No. 1-04-3394

MC BALDWIN FINANCIAL COMPANY, a )
Partnership, TB INSTITUTIONAL )
SERVICES, INC., an Illinois Corporation, and ) Appeal from the
L.T. BALDWIN, III, ) Circuit Court of
) Cook County, Illinois.
        Plaintiffs-Appellants, )
v. ) No. 03  L 4686
)
DiMAGGIO, ROSARIO & VERAJA, LLC, an ) Honorable
Illinois Limited Liability Corporation, VICTOR J. ) Allen S. Goldberg,
DiMAGGIO, III, ELIAS ROSARIO, CCS ) Judge Presiding.
FINANCIAL SERVICES, INC., an Illinois )
Corporation, MICHAEL COGLIANESE and )
GINA L. COGLIANESE, )
)
        Defendants-Appellees. )

JUSTICE GORDON delivered the opinion of the court:

Plaintiffs-appellants MC Baldwin Financial Company, TB Institutional Services, Inc.,

and L.T. Baldwin (hereinafter collectively Baldwin) appeal the circuit court's grant of summary

judgment to defendants DiMaggio, Rosario & Veraja, LLC, Victor J. DiMaggio III, and Elias

Rosario (hereinafter collectively DiMaggio[1]) and dismissal under section 2-619 of the Code of

---

[1]Baldwin's complaint named "DiMaggio, Rosario & Veraja, LLC," when, in fact, the firm

involved was "DiMaggio and Rosario LLC" (DiMaggio). The "Veraja" firm had nothing to do

with the subject of this litigation.  Nevertheless, in its motion for summary judgment, DiMaggio

stated that regardless of Baldwin's error, it was filing its motion on behalf of the Veraja firm and

itself "in order to completely dispose of this lawsuit."  It further noted: "Should this summary

No. 1-04-3394

Civil Procedure (735 ILCS 5/2-619 (West 2004)) of their complaint against defendants CCS

Financial Services, Inc., Michael Coglianese, and Gina Coglianese (hereinafter collectively

Coglianese). Baldwin brought suit against DiMaggio and Coglianese alleging that they each

breached contracts with Baldwin to provide accounting services and were professionally

negligent. The circuit court granted DiMaggio's motion for summary judgment and Coglianese's

motion for dismissal on the grounds that Baldwin's complaint was filed past the applicable two-

year statute of limitations. See 735 ILCS 5/13-214.2(a) (West 2004). For the reasons that

judgment motion be granted, there would be no basis for [Baldwin] to refile this suit against

[DiMaggio]." In its brief, Baldwin acknowledges its error in naming the wrong firm as

defendant and notes that "upon remand to the trial court [it] will request leave to amend the

complaint to name the proper accounting firm."

follow, we reverse and remand.

## I.    BACKGROUND

Baldwin's complaint, filed April 18, 2003, alleged that the defendants' breaches of contract and professional negligence in performing accounting services caused it to lose its client, the CDC companies, on April 20, 2001, and incur $2,500,000 in damages. DiMaggio and Coglianese both contend on appeal that the circuit court's order granting summary judgment and involuntary dismissal, respectively, was correct because Baldwin could have filed suit against them more than two years earlier to recover monies paid to them for services that were never completed. Specifically, DiMaggio claims that Baldwin had a cause of action against it as of October 2000, when it departed from the engagement without finishing all the services it had agreed to perform. Similarly, Coglianese claims that Baldwin could have filed suit against it for not completing its obligations before departing in January of 2001. Thus, the defendants contend that the limitations period on Baldwin's claim expired as of October 2002, and January 2003, respectively. See 735 ILCS 5/13-214.2(a) (West 2004).

Baldwin's complaint made the following factual allegations. On January 2, 1996, Baldwin entered into an agreement with CDC-Gestion to develop investment products. Under the terms of the agreement, Baldwin was to be the trading manager of future and option funds and assist CDC-Gestion in becoming a commodities trading advisor. On May 7, 1997, Baldwin entered into a "trading management agreement" with CDC-Atlante. Under the terms of the agreement, CDC-Atlante was to be set up as a "multiple sub-funds investment company," and Baldwin was to provide CDC-Atlante with extensive financial and accounting reports. CDC-

Gestion and CDC-Atlante are here referred to collectively as the CDC companies.

On May 26, 2000, Baldwin engaged DiMaggio to perform accounting services in relation to its agreements with the CDC companies. Baldwin's complaint further alleged that under the terms of their agreement DiMaggio was to perform six tasks and that two of these tasks were never completed, namely (1) the implementation of a new "Futures First" accounting system; and (2) the performance of all necessary work under the outsourcing agreement with the CDC. According to Baldwin, it completed all of its obligations and conditions precedent with regard to its contract with DiMaggio. In October of 2000, DiMaggio withdrew from its engagement with Baldwin.

Baldwin's complaint next alleged that it engaged Coglianese in November of 2000, to complete some of the services DiMaggio had previously agreed to perform in relation to Baldwin's agreements with the CDC companies. Attached as exhibits to Baldwin's complaint were two letters from Coglianese to Baldwin. A letter dated November 8, 2000, stated in pertinent part as follows:

"This confirms the nature and scope of the accounting services we will provide. We will provide general accounting services in reference to your futures fund. We will not perform an audit and thus will not express an opinion or any other assurance. Our services are limited to the representation of management. As you are aware, there are inherent limitations with such services. Because we will not perform a detailed examination of all transactions, there is a risk or [*sic*] errors that may exist and not be detected by us. We will advise you; however, of

4

any matters of that nature that come to our attention.

You recognize that the establishment and maintenance of compliance with the Regulations and common laws are the responsibility of management. As you are aware we are not attorneys and do not hold ourselves out as such.

Specifically, our services shall include:

1.    Assessing the current condition of the financial statements.

2.    Completing the January 2000 financial statements.

3.    Once the financial statements are setup, a new engagement letter will be issued to determine the monthly fee charged based on the funds' complexity.

For the above services, we shall charge a flat rate of $3000.00, plus out of pocket expenses, such as but not limited to, Federal Express charges, copies, faxes, etc.

If you agree to the arrangement outlined above, please indicate your agreement by signing below and return with the minimum required retainer check."

A second letter dated November 10, 2000, was also attached to Baldwin's complaint. It made no reference to the November 8 letter, but contained the exact same first two paragraphs and then stated:

"Specifically, our services shall include:

1.    Consultation on current financial problems and spreadsheets.

5

> For the above services, we shall charge a flat rate of $125.00, plus out of pocket expenses, such as but not limited to Federal Express charges, copies, faxes, etc."

The November 10 letter ended just as the earlier letter had by requesting it be returned with a signature and "the minimum required retainer check." Both letters were signed by Baldwin's L.T. Baldwin, and dated November 11, 2000.

On January 17, 2001, the CDC companies wrote to Baldwin charging that it had failed to file certain accounting reports that it was required to file under their trading management agreement. In the letter, the CDC companies stated that it considered Baldwin to be in breach of their agreement and gave Baldwin to the end of January 2001 to fulfill its requirements. That same day, Baldwin wrote to Coglianese informing Coglianese of its receipt of the CDC letter. On January 19, 2001, Coglianese responded by letter and resigned from the engagement.

On April 20, 2001, the CDC companies terminated all relations with Baldwin after CDC-Atlante's directors passed a resolution to "liquidate the trading assets" associated with Baldwin. Baldwin's complaint alleged that Coglianese failed (1) to provide consultation on the current financial problems and spreadsheets, (2) to assess the current condition of financial statements, and (3) to complete the January 2000 financial statements. Baldwin further alleged, as it had with regard to DiMaggio, that it performed every obligation and condition precedent due under its contract with Coglianese. As noted, Baldwin filed suit against DiMaggio and Coglianese on April 18, 2003, alleging that their breaches of contract and professional negligence caused $2,500,000 in damages when the CDC companies terminated their contracts with Baldwin.

On October 20, 2003, DiMaggio filed its answer to Baldwin's complaint and on November 25, 2003, it filed a motion for summary judgment alleging that Baldwin's claims were barred by the statute of limitations. DiMaggio contended that Baldwin paid it over $16,000 in August of 2000, and that any claim Baldwin had against it would have accrued at least by October of 2000, when DiMaggio departed from the engagement. In support, DiMaggio attached the affidavit of Victor DiMaggio, which stated:

"In or about May of 2000, [Baldwin] retained [DiMaggio] to step in and take over certain accounting aspects of the back office functions of Baldwin, in connection with Baldwin providing reporting to [the CDC companies]. It was agreed that the Plaintiffs were to pay [DiMaggio] a retainer of $8,096.45 per month for providing these services.

In or about late August of 2000, the plaintiffs paid [DiMaggio] two such monthly retainer payments, each in the amount of $8,096.45. ***

However, the Plaintiffs failed to make any of the subsequent required monthly retainer payments to [DiMaggio]. Accordingly, in October of 2000 [DiMaggio] stopped providing any further professional services to the Plaintiffs in connection with this [CDC] accounting function.

***

The Plaintiffs never commenced this lawsuit until April 18, 2003. That was more than two-and-one half years after [DiMaggio] had stopped providing, in October of 2000, any accounting services in connection with this CDC

7

undertaking of Baldwin. Moreover, no later than August of 2000, the plaintiffs had suffered 'injury,' in that they had paid two retainer payments to [DiMaggio], each in the amount of $8,096.45."

With its response to DiMaggio's motion for summary judgment, Baldwin attached the affidavit of L.T. Baldwin, which stated in pertinent part as follows:

"As of August 2000, certain monies were paid to defendants, [DiMaggio], in exchange for certain services provided by [DiMaggio] pursuant to the parties' terms of engagement.

As of October 2000, certain monies were paid to DiMaggio in exchange for certain services provided by DiMaggio pursuant to the parties' terms of engagement.

Any and all documentation related to the above attestations was in the possession of DiMaggio as of October 2000."

On August 20, 2003, Coglianese filed its first motion to dismiss pursuant to section 2-619(a)(5) of the Code of Civil Procedure, arguing that Baldwin's claims were barred by the statute of limitations because any breach of contract or professional negligence would have occurred when Coglianese withdrew from its agreement with Baldwin in January of 2001, more than two years before the complaint was filed in April of 2003. The circuit court granted Coglianese's motion on November 20, 2003, finding that Baldwin knew or should have known of damages at least in the amount of what it paid for Coglianese's services in January of 2001. On December 19, 2003, Baldwin filed a motion to reconsider the dismissal of its claims against

Coglianese, and on April 22, 2004, the circuit court granted the motion, finding that it was unclear whether Baldwin sustained any damages in January of 2001.

On May 19, 2004, Coglianese filed a second motion to dismiss pursuant to section 2-619(a)(5), which made the same argument as its first motion but included an affidavit from Michael Coglianese to attempt to show that Baldwin sustained an immediate out-of-pocket loss when Coglianese withdrew in January of 2001. The affidavit stated in pertinent part:

"The fees charged by [Coglianese] for the services contemplated by the attached Engagement Letter were $3,000.

Prior to performing any services for [Baldwin], [Coglianese] required the $3,000 to be paid upfront in the form of a retainer. [Coglianese] received and applied the $3,000 from Baldwin for the above services

Despite numerous requests by [Coglianese], [Baldwin] failed to provide [Coglianese] with the records necessary to complete the services contemplated by the attached Engagement Letter. Accordingly, on January 19, 2001, [Coglianese] sent a letter to [Baldwin] resigning from the engagement. Attached and marked Exhibit 2 is a copy of that Resignation Letter.

[Coglianese] did receive the $3000 payment for services from [Baldwin] referred to in Exhibit 1 prior to resigning form the engagement. [Coglianese] was unable to complete the services referred to in Exhibit 1 prior to its resignation."

With its reply to Baldwin's response to its motion to dismiss, Coglianese include a second affidavit from Michael Coglianese which stated in pertinent part:

9

"1. [Coglianese] was retained by [Baldwin] for two engagements, which are the subject of engagement letters dated November 8 and 10, 2000.

2. The November 8 engagement was for the services which are alleged in the complaint to have not been performed.

3. For completion of the services contemplated by the November 8 engagement, [Coglianese] was to be paid a total of $3,000. For completion of the services contemplated by the November 10 engagement, [Coglianese] was to be paid $2,500.

4. On November 20, 2000. [Baldwin] paid [Coglianese] the full amount for both of those engagements. Attached to the affidavit is a copy of both checks issued by [Baldwin] to [Coglianese], and which were cashed by [Coglianese] . These proceeds have been kept by [Coglianese].

5. There were no additional fees to be paid by [Baldwin] upon completion of the services referred to in the complaint. [Coglianese] has been paid in full."

On August 30, 2004, after Coglianese had filed its reply to Baldwin's response to its motion to dismiss, the circuit court heard arguments on the motion and then allowed Joseph R. Marconi, one of the attorneys representing Baldwin, to file an affidavit which stated in pertinent part:

"Exhibit A to this Affidavit recently came to the attention of plaintiffs. It is an invoice from [Coglianese] dated January 19, 2001, showing an amount owed by the plaintiffs to [Coglianese] in the amount of $584.75. This clearly

10

contradicts [Coglianese's] position that plaintiffs suffered injury on January 19, 2001 for paying a "flat fee" for services never rendered.

Clearly, some services were received by plaintiffs as of January 19, 2001. Exhibit A establishes that plaintiffs owed money to defendants on January 19, 2001, and, thus had no right to sue [Coglianese] to recover the $5,500 retainer."

On October 7, 2004, the circuit court issued its order and memorandum opinion on Coglianese's motion to dismiss and DiMaggio's motion for summary judgment. With regard to the Coglianese motion the court noted:

"[Coglianese has] now filed a second motion to dismiss and [has] attached affidavits and copies of checks issued by [Baldwin] and cashed by defendants. In the affidavits, Mr. Michael Coglianese states that [Coglianese's] flat rate for services was paid in full, that no additional fees were paid by Plaintiff upon completion of these services and that [Coglianese] 'was unable to complete the services referred to in [the Engagement Letter].' Defendants therefore argue that it is clear on the record that as of January 19, 2001, when Defendants resigned, Plaintiffs suffered damages at least in the amount what was paid to Defendants for services admittedly not performed. In the absence of contradictory affidavits by Plaintiffs, this Court agrees."

The court made no reference to Baldwin's August 30, 2004, affidavit of Marconi. With regard to DiMaggio's motion for summary judgment, the court stated:

"The Court finds that it is undisputed that in May of 2000 Plaintiffs retained these

11

Defendants to perform accounting services and in August of the same year, paid these Defendants for some of this work. Defendants then withdrew from the project in October of 2000 at which point the allege [*sic*] breach occurred. Again, Plaintiffs did not file the lawsuit until April 20, 2003. This beyond [*sic*] the two-year period that the plaintiffs had to file a complaint under section 735 ILCS 5/13-214.2. Accordingly, the Court finds that the motion for summary judgment must be granted for the same reasons state by the Court above."

## II.    ANALYSIS

We first address the circuit court's grant of summary judgment to DiMaggio. We review a ruling on a motion for summary judgment *de novo*. Abrams v. City of Chicago, 211 Ill. 2d 251, 258, 811 N.E.2d 670, 674 (2004). Summary judgment is appropriate "where the pleadings, affidavits, depositions, admissions, and exhibits on file, when viewed in the light most favorable to the nonmovant, reveal that there is no issue as to any material fact and that the movant is entitled to judgment as a matter of law." Abrams, 211 Ill. 2d at 257, 811 N.E.2d at 674; 735 ILCS 5/2-1005(c) (West 2004). If a party moving for summary judgment includes an affidavit containing facts which, if not contradicted, would entitle it to judgment as a matter of law, the opposing party cannot rely upon his pleadings to raise a genuine issue of material fact. Zannis v. Lake Shore Radiologists Ltd., 104 Ill. App. 3d 484, 487, 432 N.E.2d 1108, 1110 (1982).

The statute of limitations applicable to this case is codified in section 13-214.2(a) of the Code of Civil Procedure:

"(a) Actions based upon tort, contract or otherwise against any person,

partnership or corporation registered pursuant to the Illinois Public Accounting

Act, as amended, or any of its employees, partners, members, officers or

shareholders, for an act or omission in the performance of professional services

shall be commenced within 2 years from the time the person bringing an action

knew or should reasonably have known of such act or omission." 735 ILCS 5/13-

214.2(a) (West 2004).

DiMaggio contends that the limitations period on any claim Baldwin had against it would have begun at least as of October 2000, when DiMaggio withdrew from the engagement, because as of that date, Baldwin had a right to recover the fees it paid for work DiMaggio had not completed. Consequently, DiMaggio maintains that Baldwin's right to maintain an action against it terminated in October of 2002, some six months before Baldwin filed its claim. We disagree.

The general rule is that the limitations period begins to run "when facts exist which authorize the bringing of an action." Schreiber v. Hackett, 173 Ill. App. 3d 129, 131, 527 N.E.2d 412, 413 (1998). In other words, a cause of action accrues when all the elements of the cause of action are present. The elements of a contract cause of action are: (1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages. Village of South Elgin v. Waste Management of Illinois, Inc., 348 Ill. App. 3d 929, 940, 810 N.E.2d 658, 669 (2004). The elements of a professional negligence cause of action are: (1) the existence of a professional relationship, (2) a breach of duty arising from that relationship, (3) causation, and (4) damages. See Belden v.

13

Emmerman, 203 Ill. App. 3d 265, 268, 560 N.E.2d 1180, 1181 (1990). Under either claim, it is clear that damages are an essential element.

DiMaggio's claim that Baldwin had a right to recover the fees upon its departure from the engagement is essentially an argument that Baldwin had a right to restitution. A party injured by another's breach or repudiation of a contract usually seeks recovery in the form of damages based on his "expectation interest," which involves obtaining the "benefit of the bargain," or his "reliance interest," which involves reimbursement for loss cause by reliance on a contract. Restatement (Second) of Contracts §344 (1981). However, where a defendant has committed a total breach or a repudiation of a contract, a plaintiff may alternatively seek restitution. Restatement (Second) of Contracts §373 (1981). A "restitution interest" is a party's "interest in having restored to him any benefit that he has conferred on the other party." Restatement (Second) of Contracts §344(c), at 103 (1981). An award of restitution is designed to prevent unjust enrichment by disgorging the benefit conferred to the defendant by the plaintiff. Restatement (Second) of Contracts §344, Comment a (1981). Restitution can be measured by either the "reasonable value" of the benefit received by the defendant, or by the "extent to which the [defendant's] property has been increased in value or his other interests advanced." Restatement (Second) of Contracts §371, at 202 (1981). However, a plaintiff seeking restitution may have his award reduced by the amount the defendant's part performance prior to breach or repudiation constituted an advantage to the plaintiff. See W. Jaeger, Williston on Contracts §1478, at 264 (1970); Cotter v. Parrish, 166 Ill. App. 3d 836, 842, 520 N.E.2d 1172, 1176 (1988) (holding that restitution to plaintiffs consisted of all monies paid to defendants on the contract

14

"minus any benefit they received"); see also Restatement (Third) of Restitution and Unjust Enrichment (Tentative Drafts) §37, Comment e, Illustration 12 (2004), citing Bollenback v. Continental Casualty Co., 243 Or. 498, 414 P. 2d 802 (1966). Thus, DiMaggio essentially contends that Baldwin had a claim for restitution in that Baldwin conferred a benefit in the form of payment of fees, and DiMaggio thereafter repudiated the contract before performing all of its obligations. Therefore, according to DiMaggio, Baldwin had a right to recover the fees paid to DiMaggio to the extent that it did not earn them.

More importantly, however, DiMaggio contends that the accrual of this claim for restitution started the running of the limitations period on any claim Baldwin against it, including the claim for consequential damages relating to the loss of the CDC companies. Some support for this contention may be found in Golla v. General Motors Corp., 167 Ill. 2d 353, 657 N.E.2d 894 (1995). In that case, the plaintiff brought a products liability action against defendant alleging injuries caused when the seat of her automobile came loose during a collision. Golla, 167 Ill. 2d at 355, 657 N.E.2d at 895. Plaintiff suffered immediately apparent injuries to her left wrist, shoulder and arm, but did not file her claim until nearly four years after the accident. Golla, 167 Ill. 2d at 355-56, 657 N.E.2d at 896. Plaintiff alleged that the statute of limitations did not begin to run until she was diagnosed with reflex sympathetic dystrophy (RSD) over two years after the accident. Golla, 167 Ill. 2d at 356, 657 N.E.2d at 896. The supreme court rejected this argument, noting:

"[t]his court has repeatedly held that where the plaintiff's injury is caused by a 'sudden traumatic event,' such as the automobile accident that occurred in

15

this case, the cause of action accrues, and the statute of limitations begins to run, on the date the injury occurs. [Citations.]" Golla, 167 Ill. 2d at 362-63, 657 N.E.2d at 899.

The court then distinguished the "sudden traumatic event" cases from those involving "latent" physical injuries such as where the plaintiff is exposed to toxic substances or subjected to medical malpractice. Golla, 167 Ill. 2d at 366, 657 N.E.2d at 900-01. In such cases, the court noted, "the plaintiffs did not discover that they suffered *any* injury until long after the tortious conduct occurred. *** In this case, on the other hand, the plaintiff knew that she suffered injuries at the time of the accident." Golla, 167 Ill. 2d at 367, 657 N.E.2d at 901. The court further noted:

"This court has never suggested that plaintiffs must know the full extent of their injuries before the statute of limitations is triggered. Rather, our cases adhere to the general rule that the limitations period commences when the plaintiff is injured, rather than when the plaintiff realized the consequences of the injury or the full extent of her injuries. [Citations.]" Golla, 167 Ill. 2d at 364, 657 N.E.2d at 899-900.

A similar discussion can be found in Dancor International, Ltd. v. Friedman, Goldbert & Mintz, 288 Ill. App. 3d 666, 681 N.E.2d 617 (1997). In that case, the plaintiff sued his accountant for negligently failing to discover the fraud and embezzlement of an employee. Dancor, 288 Ill. App. 3d at 668. On appeal, plaintiff argued, among other things, that even if the statute of limitations had run as to damages known to exist at an earlier date, the limitations

period had not run as to similarly caused damages discovered at a later date. The court rejected this argument noting: "[t]he mere fact that the extent of injury is not immediately known or ascertainable does not postpone the triggering of the statute of limitations." Dancor, 288 Ill. App. 3d at 677, 681 N.E.2d at 625, citing Golla, 167 Ill. 2d 353, 657 N.E.2d 894.

Thus, based on our supreme court's holding in Golla, DiMaggio would contend that although Baldwin's initial damages based on the overpayment of fees may have been relatively minor in comparison to the ultimate consequential damages alleged in relation to the CDC companies, the limitations period, nevertheless, commenced upon the incurrence of those damages. DiMaggio would also contend that its departure from the engagement was like the sudden traumatic event in Golla in that it clearly put Baldwin on notice that it may have been wrongfully damaged.

Baldwin has maintained throughout its prosecution of this case that it sustained no damages until its loss of the CDC companies and that defendants' contentions to the contrary are laden with questions of fact. However, Baldwin alternatively contends that even if a cause of action for the return of fees did accrue at an earlier date and then expired before Baldwin actually filed suit, the damages resulting from the loss of the CDC companies were part of wholly separate cause of action with a distinct limitations period running from April 2001 to April 2003. In support Baldwin cites Cuerton v. American Hospital Supply Corp., 136 Ill. App. 3d 231, 482 N.E.2d 187 (1985). In Cuerton, plaintiff sued the defendant doctor on March 31, 1983, for two injuries suffered as a result of surgeries performed on February 12 and May 15, 1980. Cuerton, 136 Ill. App. 3d at 234, 482 N.E.2d at 189. Plaintiff suffered readily noticeable

injuries as a result of the first surgery, but he did not discover that the second surgery caused him

to become a quadriplegic until September of 1982. Cuerton, 136 Ill. App. 3d at 234, 482 N.E.2d

at 189. The applicable statute of limitations stated that no action could be brought more than 2

years after the plaintiff "knew, or through the use of reasonable diligence should have known" of

the injury. 735 ILCS 5/13-212(a) (2004). The appellate court affirmed the lower court's section

2-619 dismissal of the first injury on the basis of timeliness because the plaintiff did not allege

any delay in discovering the first injury. Cuerton, 136 Ill. App. 3d at 237, 482 N.E.2d at 191.

However, the court reversed the trial court's dismissal with regard to the quadriplegia, noting:

"no amount of diligent investigation of the circumstances [prior to September of 1982] would

have revealed the particular breach of duty which ultimately led to plaintiff's quadriplegia."

Cuerton, 136 Ill. App. 3d at 240, 482 N.E.2d at 193. The court further stated:

> "In the present case, although plaintiff knew or should have known of the
>
> possibility of the alleged wrongful conduct of defendant relating to the 1980
>
> surgeries, the concurrence of this knowledge with that of the physical problem of
>
> quadriplegia did not occur until [September of 1982]. Therefore, because of the
>
> different nature of this problem, together with the time of its manifestation, it
>
> cannot be said that for discovery purposes the brain injury could be considered as
>
> consequential damages from the prior injury or alleged act of negligence
>
> occurring in 1980. For this reason we view the present case as if it involves two
>
> separate cases." Cuerton, 136 Ill. App. 3d at 240, 482 N.E.2d at 193.

Thus, Golla and Dancor generally stand for the proposition that existence of some injury

18

starts the running of the limitations period on any claim arising out of the same events even though the injury may further develop or additional injuries may result form the same breach of duty. Cuerton, on the other hand, describes a situation where an injury arising from a prior surgery will not affect the limitations period of a later injury sustained through a second surgery. Thus, Cuerton, upholds different periods of limitation as reflected in two distinct surgeries and, consequently, does not necessarily conflict with Golla. To the extent Cuerton could be interpreted as allowing a subsequent, more severe injury to trigger a separate limitations period would be in contravention to Golla and would have to fail. However, Cuerton can be distinguished in that although the two surgeries were performed in response to one original underlying ailment, they nevertheless involved two separate breaches occurring on different days. Additionally, we recognize some differences between the facts of this case and those of Golla and Dancor that could potentially support Baldwin's contention that two causes of action with two separate limitations periods arose in this case. For instance, in those cases, the original and subsequent injuries were of the same kind. In Golla, the initial physical injuries developed into a more severe physical condition, and in Dancor, there were earlier and later losses as a result of the accountant's alleged failure to discover the embezzlement. In contrast, in the instant case, the initial alleged injury was based on the payment of fees, and the later was based the loss of a client. However, despite these differences, we also acknowledge that Cuerton is not on all fours in that it involved two separate breaches.

Although not raised by Baldwin, we find some support for the proposition that two limitations periods can arise from the same underlying breach of contract with respect to the

alternative remedies of restitution and damages. These two remedies are facially inconsistent and may, under certain circumstances, be mutually inconsistent, requiring an election of remedies. See Restatement (Second) of Contracts §344 (1981). An action for restitution generally requires rescission and disaffirmance of the contract and involves restoring the plaintiff to his original position. See R. Lord, Williston on Contracts §68:2, at 37 (2003), Restatement (Second) of Contracts §373 (1981). In contrast, an action for damages is consistent with affirmation of the contract, which would have entitled the promisee to its performance and correspondingly to damages incurred by its breach. See Restatement (Second) of Contracts §344 (1981). Consequently, a plaintiff is free to elect which remedy to pursue. See Restatement (Second) of Contracts §378 (1981). Thus, it can be urged that a plaintiff may forego an action to disaffirm and seek restitution when that right of action accrues and choose instead to treat the contract as ongoing until damage resulting from its nonperformance arises or becomes manifest. Arguably, then, the period of limitations for a damages claim would commence when those damages accrue, which in this case, did not occur until the CDC companies terminated their agreement with Baldwin. The limitations period for bringing the action for those damages would arguably not commence as of the time of DiMaggio's early withdrawal, which would merely have entitled Baldwin to disaffirm the agreement and seek restitution of the status quo through a rescission action. While, as discussed above, this does not equate to the specific facts and analysis in Cuerton, it would be consistent with its holding and general analysis and would not necessarily be contravened by Golla. However, we need not resolve this question, which, as noted before, was not raised or argued by the parties, given that we agree with Baldwin's initial

20

contention that there are material questions of fact as to whether an act for restitution, in fact, accrued to Baldwin at the time of termination. Namely, under the facts as presented, it is not clear as a matter of law that Baldwin was ever entitled to recoup any of its payments to DiMaggio, notwithstanding DiMaggio's breach.

With regard to proof of damages sustained by Baldwin at the time of its departure, DiMaggio contends that it was entitled to summary judgment because it provided an affidavit containing facts that where not effectively contradicted by Baldwin and which entitled it to summary judgment. Specifically, DiMaggio contends that the affidavit of Victor DiMaggio established that Baldwin had a claim in October of 2000 for the recovery of fees which made its April 2001 complaint untimely. We disagree.

Although, as urged by DiMaggio, we must view the facts in the Victor DiMaggio affidavit that are not contradicted by counteraffidavit as true (Safeway Insurance Co. v. Hister, 304 Ill. App. 3d 687, 691 (1999)), there still remains a question of fact as to whether a cause of action accrued upon DiMaggio's departure. The DiMaggio affidavit, as noted, stated that in May of 2000, Baldwin engaged DiMaggio to perform accounting services in relation to the CDC companies for $8,096.45 per month, that Baldwin made two such payments in August of 2000, that no further payments were made and that, consequently, in October of 2000, DiMaggio ceased performing any accounting services for Baldwin. The only counteraffidavit offered by Baldwin was the L.T. Baldwin affidavit, which, as noted, merely stated: "as of October 2000, certain monies were paid to DiMaggio in exchange for certain services provided by DiMaggio pursuant to the parties' terms of engagement." Thus, DiMaggio is correct that Baldwin did not

contradict its affidavit by counteraffidavit.

However, regardless of any lack of contradiction, the facts in the DiMaggio affidavit do not clearly establish that Baldwin had a claim to pursue as of October 2000. As noted, to support a cause of action for either breach of contract or professional negligence, some injury must be sustained. See Village of South Elgin, 348 Ill. App. 3d at 940, 810 N.E.2d at 669; Belden, 203 Ill. App. 3d at 268, 560 N.E.2d at 1181. Under either claim, we do not believe that the DiMaggio affidavit established that Baldwin sustained any injury in October 2000 that would entitle it to an action for restitution.

DiMaggio seems to contend that the fact that any payment was made means that Baldwin sustained some injury. However, DiMaggio also contends that it stopped providing accounting services in October of 2000, because Baldwin had failed to make a required payment. Thus, according to DiMaggio, at the time it withdrew from the engagement it either had provided services in excess of what it had been paid or was due payment in advance of any further work. This averment in the DiMaggio affidavit is in direct opposition to DiMaggio's assertion that Baldwin sustained an injury and concurrently accrued a cause of action by making payments on the contract. This inconsistency, alone, raises a question of fact which would rule out summary judgment. See Abrams, 211 Ill. 2d at 257, 811 N.E.2d at 674; 735 ILCS 5/2-1005(c) (West 2004); Soderlund Brothers, Inc. v. Carrier Corp., 278 Ill. App. 3d 606, 614, 663 N.E.2d 1, 7 (1995) ("where the party opposing summary judgment fails to file counteraffidavits, the moving party should not be awarded summary judgment unless the affidavits filed in support of that motion establish the right to judgment as a matter of law").

Additionally, however, further questions of fact are found in an examination of the payment arrangement between Baldwin and DiMaggio. According to the DiMaggio affidavit, the parties' contract started in May of 2000, and two monthly payments were made in August of 2000. However, DiMaggio does not explain to what months those payments were to be applied, whether payments were due in advance or at the end of the month, or whether any payments were made for the months preceding the August payment. Consequently, it is impossible for us to deduce what monies may have been owed to DiMaggio or overpaid by Baldwin at the time DiMaggio withdrew from the engagement. As noted, a plaintiff seeking restitution may recover the value of the benefit conferred to the defendant, but may have that amount reduced by the value of any part performance completed by the defendant prior to breach or repudiation. See W. Jaeger, Williston on Contracts §1478, at 264 (1970); Cotter v. Parrish,166 Ill. App. 3d at 842, 520 N.E.2d at 1176; Restatement (Third) of Restitution and Unjust Enrichment (Tentative Drafts) 37, Comment e, Illustration 12 (2004), citing Bollenback, 243 Or. 498, 414 P.2d 802. Because it is not clear, even when viewing the DiMaggio affidavit as true, that Baldwin was entitled to recoup any amount of money from DiMaggio, summary judgment was inappropriate. Abrams, 211 Ill. 2d at 257, 811 N.E.2d at 674; 735 ILCS 5/2-1005(c) (West 2004).

We additionally note that the DiMaggio affidavit recited that "no later than August of 2000, [Baldwin] suffered an 'injury,' in that they had paid two retainer payments to DiMaggio." DiMaggio would again contend that this assertion must be taken as true because it was not contested by counteraffidavit. As noted, the paragraph in question stated:

"The Plaintiffs never commenced this lawsuit until April 18, 2003. That

23

was more than two-and-one half years after [DiMaggio] had stopped providing, in

October of 2000, any accounting services in connection with this CDC

undertaking of Baldwin.  Moreover, no later than August of 2000, the plaintiffs

had suffered 'injury,' in that they had paid two retainer payments to [DiMaggio],

each in the amount of $8,096.45."

However, we need not accept this assertion because in the context of the surrounding paragraphs

of the affidavit, it is nothing more then a legal conclusion as to when a lawsuit could have

commenced.  See Official Reports Advance Sheet No. 8 (April 17, 2002, R. 191, eff. July 1,

2002; Geary v. Telular Corp., 341 Ill. App. 3d 694, 699, 793 N.E.2d 128 (2003) ("Affidavits *** 

must not contain conclusions, but evidentiary facts to which the affiant is capable of testifying.

[Citation.] Unsupported assertions, opinions, and self-serving or conclusory statements do not

comply with Supreme Court Rule 191(a) [Citation.]").

DiMaggio further appears to contend that because Baldwin did not file a counteraffidavit

reasserting the damage it claims in the complaint to have sustained regarding the loss of the

CDC companies in April of 2000, the record is therefore insufficient to support that allegation.

However, DiMaggio never controverted Baldwin's damages claim by any extrinsic submission.

To the extent the facts alleged in Baldwin's complaint were not traversed by the DiMaggio

affidavit or other extrinsic submissions, the unverified pleadings stand as true. See Lesnik v.

Estate of Lesnik, 82 Ill. App. 3d 1102, 1106, 403 N.E.2d 683 (1980) ("unsupported allegations in

a complaint do not raise a question of fact *when* affidavits and depositions in support of a motion

for summary judgment contain evidentiary facts to the contrary. [Citation.]" (Emphasis added.)).

Finally, DiMaggio additionally appears to contend that Baldwin's claim of damages with regard to the CDC companies does not comply with Illinois law in that Baldwin does not allege a delayed discovery. In support, DiMaggio cites Dancor, 288 Ill. App. 3d at 672-73, 681 N.E.2d at 622. The court in Dancor, described the discovery rule in relation to the accounting statute of limitations as follows:

> "As provided in section 13-214.2, an accounting malpractice action must be commenced within two years from the time the person bringing the action knew or reasonably should have known of the act or omission. [Citation.] This statutory provision has incorporated within it a discovery rule, which delays commencement of the statute of limitations until the plaintiff knows or reasonably should have known of the injury and that it may have been wrongfully caused. [Citations.] The effect of the discovery rule is to postpone the starting of the limitations period. [Citation.] When a plaintiff uses the discovery rule to delay commencement of the statute of limitations, the burden is on the plaintiff to prove the date of discovery. [Citation.]" Dancor, 288 Ill. App. 3d at 672-73, 681 N.E.2d at 622.

Thus, according to DiMaggio, Baldwin failed to properly allege and support its claim of delayed discovery of its damages. However, we believe DiMaggio misunderstands Dancor and the applicability of the discovery rule. The discovery rule can delay the commencement of the limitations period where an injury has already occurred but has not been discovered. See Dancor, 288 Ill. App. 3d at 672-73, 681 N.E.2d at 622. However, the period of limitations does

not commence in the first instance until an injury is incurred. Schreiber, 173 Ill. App. 3d at 131, 527 N.E.2d at 413. Where no injury has yet occurred, the discovery rule is irrelevant because there is nothing to discover. See Nolan v. Johns-Manville Asbestos, 85 Ill. 2d 161, 171, 421 N.E.2d 864, 868 (1981); Dancor, 288 Ill. App. 3d 666, 681 N.E.2d 617. Baldwin did not claim that it discovered its damages in April of 2001, but that they actually first occurred when DiMaggio departed in October of 2000. Rather, according to Baldwin's claim, it had no damages whatsoever until April of 2001. Thus, with regard to those injuries alone, Baldwin's suit filed in April of 2003 was timely.

We next address the circuit court's section 2-619(a)(5) dismissal of Baldwin's claim against Coglianese. A section 2-619 motion to dismiss

"admits the legal sufficiency of the complaint and raises defects, defenses or other affirmative matters, such as the untimeliness of the complaint, which appear on the face of the complaint or are established by external submissions which act to defeat the plaintiff's claim, thus enabling the court to dismiss the complaint after considering issues of law or easily proved issues of fact." Lipinski v. Martin J. Kelly Oldsmobile, Inc., 325 Ill. App. 3d 1139, 1144, 759 N.E.2d 66, 69 (2001).

"The defendant has the burden of proving the affirmative defense relied upon in a section 2-619 motion, and such a motion should only be granted if the record establishes that no genuine issue of material fact exists." Streams Condominium No. 3 Ass'n v. Bosgraf, 219 Ill. App. 3d 1010, 1013-14, 580 N.E.2d 570, 573 (1991). The fact that a complaint is filed after the running of the applicable statute of limitations is a valid reason for dismissal pursuant to section 2-619(a)(5).

<u>Riordin v. McIntosh</u>, 319 Ill. App. 248, 48 N.E.2d 800 (1943); 735 ILCS 5/2-619(a)(5) (West 2004).  The appellate standard of review applicable to section 2-619 dismissals is *de novo*. <u>Lipinski</u>, 325 Ill. App. 3d at 1144, 759 N.E.2d at 69.

Coglianese contends, much like DiMaggio, that the limitations period began to run on Baldwin's claim on January 19, 2001, the date Coglianese resigned.  Specifically, Coglianese contends that Baldwin sustained immediate damages as of January 19, 2001, in that it sustained an "out-of-pocket" loss for the payments made to Coglianese for professional services that were not performed.  Coglianese also contends that Baldwin could have brought a claim as of January 19, 2001, for the cost of hiring replacement accountants to complete the work Coglianese had agreed to perform.  Coglianese contends that these factors, coupled with the fact that Baldwin's complaint admitted that the CDC companies considered Baldwin to be in breach of their agreement as of January 17, 2001, make it clear that the limitations period on Baldwin's claims expired in January of 2003, several months before Baldwin filed its suit.

With regard to these contentions, we refer back to our treatment of the similar claims made by DiMaggio, which would control the issues involved here.  See *supra* discussion of <u>Golla</u>, <u>Dancor</u>, and <u>Cuerton</u>.  Here, too, as with respect to DiMaggio's contentions, it may be that a claim for restitution would not, in any event, trigger the limitations period on a claim for damages.  However, as with DiMaggio, neither Baldwin nor Coglianese has raised or developed that contention, and we find no need to resolve it since similar issues of fact remain.

Like DiMaggio, Coglianese asserts that the statute of limitations began to run on any claim Baldwin had against it when Coglianese prematurely departed from the engagement.  As

noted, as an alternative to damages, a plaintiff may seek restitution, which involves disgorging any benefit conferred to the defendant. Restatement (Second) of Contracts § 344,Comment a (1981). However, as we discussed with respect to DiMaggio, a plaintiff's award of restitution may be reduced by the amount the defendant's part performance prior to breach or repudiation benefitted the plaintiff. See W. Jaeger, Williston on Contracts §1478, at 264 (1970); Cotter v. Parrish,166 Ill. App. 3d at 842, 520 N.E.2d at 1176; Restatement (Third) of Restitution and Unjust Enrichment (Tentative Drafts) 37, Comment e, Illustration 12 (2004), citing Bollenback, 243 Or. 498, 414 P. 2d 802 . The record is unclear with respect to how Baldwin was supposed to pay Coglianese for its services. Thus, it is unclear whether Baldwin sustained any out-of-pocket loss upon Coglianese's withdrawal that would impart a right to bring an action for restitution.

First, we note that the engagement letters, which were drafted by Coglianese, are unclear. The November 8 letter enumerates three tasks and calls for a flat rate of $3,000 plus out of pocket expenses. The November 10 letter lists one task for Coglianese to complete, which is not named in the previous letter, and it calls for a flat rate of $125, plus out of pocket expenses. Also, as noted, the two letters make no reference to each other. However, both letters also call for Baldwin to submit a "the minimum required retainer check." These letters leave unclear whether the fees contemplated are, in fact, flat fees for specific tasks or whether the specific amounts named ($3,000 and $125, respectively) or are merely up-front "retainers." We note that Webster's defines "retainer" as "a preliminary fee for services." New American Webster Dictionary 391 (1972). Moreover, although we might presume if it were proper to do so that the intent of Coglianese in the November 10 letter was to demand $125 *per hour* for its work with

28

regard to the specific task named in that letter, the letter provides no such clarification.

Furthermore, the Coglianese affidavits do not add clarity to the engagement letters. The first affidavit, like the last sentences of the engagement letters, states that the $3,000 (presumably from the November 8 letter) was to be "paid upfront as a retainer." Thus, the initial ambiguity of the engagement letters is perpetuated in the Coglianese affidavit. Moreover, the second affidavit again refers to $3,000 as the fee associated with the November 8 letter, but says the fee contemplated by the November 10 letter was $2,500. Attached to this affidavit were copies of two checks from Baldwin to Coglianese, one for $3,000, and one for $2,500. However, Coglianese gives no explanation of how the "flat fee of $125" from the November 10 letter actually meant $2,500. Although we can imagine that this figure was the result of 20 hours of work at a rate of $125 per hour, Coglianese does not explain or assert this calculation and such a presumption is not ours to make on review of a section 2-619(a)(5) dismissal. Streams Condominium No. 3 Ass'n, 219 Ill. App. 3d at 1013-14, 580 N.E.2d at 573.

Furthermore, questions of fact are raised by the Marconi affidavit submitted by Baldwin in opposition to Coglianese's motion. As noted, that affidavit stated that at the time Coglianese withdrew, Baldwin was indebted to Coglianese in the amount of $584.75. While we acknowledge that the mere fact that Coglianese submitted a bill to Baldwin does not definitively prove which party was indebted to the other, the assertion tends to prove Baldwin's position that no cause of action with regard to the payment of fees had accrued. In any case, the Marconi affidavit raises a question of fact as to who was indebted to whom as of January 2001.

Coglianese contends that the Marconi affidavit is precluded by a judicial admission in

Baldwin's complaint. Specifically, Coglianese points to paragraph 46 of the complaint, which alleged that Baldwin "performed in whole each and every obligation and condition precedent due form it under the terms of the contract *** including the payment of all statements rendered to [Baldwin] by [Coglianese]." Thus, Coglianese urges that Baldwin was precluded from asserting through the Marconi affidavit that it actually owed Coglianese $584.75.

Coglianese is correct that facts alleged in a current pleading constitute judicial admissions, and that judicial admissions have " 'the effect of withdrawing a fact from contention.' " Brummet v. Farel, 217 Ill. App. 3d 264, 267, 576 N.E.2d 1232, 1234 (1991), quoting M. Graham, Evidence Text, Rules, Illustrations, and Problems, at 146 (1983). However, the Marconi affidavit does not literally speak to the same facts alleged in Baldwin's pleadings. The affidavit, and the attached invoice on which it relies, states that the $584.75 was billed to Baldwin on January 19, 2001. This was the same day that Coglianese withdrew from the engagement. Moreover, the invoice itself states "all invoices are due and receivable within 30 days." Baldwin's complaint, on the other hand, implicitly refers to Baldwin's obligations prior to Coglianese's breach and departure. In other words, inherent within the allegations of paragraph 46 of Baldwin's complaint is the contention that Coglianese did not have cause to depart based on any failure of Baldwin's. Thus, the fact that Coglianese billed Baldwin on the day of its departure does not contradict the judicial admission in Baldwin's pleadings and is, therefore, not precluded.

Coglianese further contends that the Marconi affidavit was properly disregarded by the circuit court because it did not constitute competent evidence. Coglianese points to the fact that

30

the affidavit was filed on the day of the hearing on the motion. With regard to this argument, we note that the circuit court allowed Baldwin to file the Marconi affidavit on the day it heard arguments on the motion, but then failed to make reference to the affidavit in its written order and memorandum opinion and, in fact, stated that Coglianese's motion was made "in the absence of contradictory affidavits." Whether to consider affidavits filed after a hearing on a motion to dismiss is within the discretion of the trial court since " '[i]t is not intended cases should be heard piecemeal.' " Tomlen Group, Ltd. v. Goldfarb, 101 Ill. App. 3d 154, 158, 427 N.E.2d 1047 (1981), quoting Gliwa v. Washington Polish Loan & Building Ass'n, 310 Ill. App. 465, 478, 34 N.E.2d 736 (1941); see also Bowen v. Bowen, 265 Ill. 638, 640,107 N.E.2d 129 (1914). However, because the circuit court allowed the affidavit to be filed, it is part of the record on appeal, and the fact that the circuit court made no mention of the affidavit in its order does not constitute a rejection of it or otherwise expunge it from consideration as part of the record. We therefore consider that affidavit among the other aforementioned factors rasing factual questions in this case.

Coglianese finally contends that Baldwin could have hired replacement accountants and then had a cause of action for any additional expenses incurred. However, a plaintiff cannot claim damages he could potentially have incurred had he taken a certain action when, in actuality, he incurred no such damages. See Draper v. Minneapolis-Moline, Inc., 100 Ill. App. 2d 324, 330, 241 N.E.2d 342, 345 (1968). Whether Baldwin had an obligation to mitigate its damages by immediately hiring replacement accountants is an issue beyond the scope of this appeal and will therefore not be addressed.

### III.     Conclusion

For the foregoing reasons, we reverse the judgments of the circuit court and remand for further proceedings consistent with this opinion.

Reversed and remanded.

BURKE and McBRIDE, JJ., concur.