2023 IL App (1st) 221352

SIXTH DIVISION
July 21, 2023

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

No. 1-22-1352

| | | |
|---|---|---|
| SANTA ROSA MALL, LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 2021 L 010841 |
| | ) | |
| AON RISK SERVICES CENTRAL, INC., d/b/a Aon Risk | ) | Honorable |
| Insurance Services Central, Inc., | ) | Michael F. Otto, |
| | ) | Judge Presiding. |
| Defendant-Appellee. | ) | |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices C.A. Walker and Oden Johnson concurred in the judgment.

**OPINION**

¶ 1     The plaintiff in this case, Santa Rosa Mall, LLC (Santa Rosa), alleged that in the aftermath

of Hurricane Maria, which struck Puerto Rico in September 2017, it attempted to collect property

insurance proceeds it was entitled to under a lease agreement with its longtime tenant, a Puerto

Rican subsidiary of Sears Holdings Corporation (Sears). Sears at first agreed that the lease required

it to deposit the insurance proceeds in a special account in Santa Rosa's name. But it later changed

course, asserting that it had instead elected to self-insure the property under a different section of

the lease that did not require it to deposit funds in a separate account. While repairs were underway,

Sears filed for Chapter 11 bankruptcy protection and settled its claims against the insurers it had contracted with to insure the property. Santa Rosa alleges that it was ultimately forced to use its own funds—totaling over $20 million—to complete the necessary repairs to the property Sears had leased from the mall, despite its clear right to require Sears's insurance to pay for those repairs.

¶ 2　　Santa Rosa sued the defendant in this case, Aon Risk Services Central, Inc. (d/b/a Aon Risk Insurance Services Central, Inc.) (Aon), for professional negligence and tortious interference with contract, on the theory that Aon, the insurance broker that contracted with Sears to place insurance policies for Sears's properties worldwide, was aware of Sears's obligations under the lease agreement with Santa Rosa and was actively advising it during the period in question on matters of risk management, claims resolution, and compliance with the insurance requirements in leases.

¶ 3　　The circuit court dismissed the claims under section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2020)) for failure to state a claim on which relief could be granted. It concluded that Aon owed no professional duty of care to Santa Rosa and there were no allegations of fact from which one could reasonably infer that Aon played an active, as opposed to a merely passive, role in Sears's alleged breach of the lease agreement. Santa Rosa now appeals.

¶ 4　　For the reasons that follow, we affirm.

¶ 5　　　　　　　　　　　　　I. BACKGROUND

¶ 6　　　　　　　　A. The Lease Agreement Between Sears and Santa Rosa

¶ 7　　Santa Rosa is the owner of a shopping center in Bayamón, Puerto Rico. In 1965, it leased a retail space within the shopping center to Sears to operate as a department store. Section 6.01 of the lease required Sears to "maintain at [its] sole cost and expense, for the benefit of [Santa Rosa] and [Sears], insurance with respect to the Demised Premises" for, among other things, "losses due to windstorm." Section 6.02 of the lease gave Sears "the option of effecting such insurance through

an insurance company of recognized standing satisfactory to [Santa Rosa]" or "through [Sears's] Parent Corporation *** which would act as a self-insurer." If Sears chose to engage an insurance company, it was required to promptly secure the necessary policies and furnish Santa Rosa with certificates thereof. The policies had to "contain loss payable clauses to [Santa Rosa] and [Sears]" as provided in section 6.03 of the lease. If covered losses exceeded $100,000, then under section 6.03(b)(3) of the lease, "[t]he net sums recovered by [Santa Rosa] and [Sears] on account of loss or damage, whether under the policies taken out as aforesaid, or under other insurance policies taken out by [Sears] and indemnifying for physical loss," were to be "deposited in a special account in the name of [Santa Rosa]" to be used, as needed, for restoration and rebuilding.

¶ 8     If Sears instead chose to self-insure, it was required to promptly advise Santa Rosa of that election and furnish it with a "certificate from its Parent Corporation specifying the exact insurance coverage which the Parent Corporation [would] be responsible for" and an annual report evidencing sufficient assets to cover the self-insured risks. And in the event of a loss, if Sears chose to self-insure, section 6.04 required it to promptly undertake repairs and furnish to Santa Rosa a written undertaking of its parent corporation to provide all funds required to complete that work.

¶ 9                          B. Sears's Relationship with Aon

¶ 10    Sears entered into a master services agreement with Aon, effective December 31, 2011, under which Aon agreed to provide Sears with "insurance and risk management brokerage and consulting services" pursuant to various statements of work (SOWs). Section 12.13 of the agreement stated: "Other than [Sears's] Affiliates, there are no third party beneficiaries to this Agreement."

¶ 11    Santa Rosa attached three of the SOWs entered into between Sears and Aon to its initial complaint. The first of these, which took effect in 2011 when the master services agreement was

signed, stated that it would terminate on December 30, 2016, almost a year before the property damage at issue here occurred. Santa Rosa alleged, however, that "the basic services AON provided to Sears did not change over time" from one SOW to another. In that initial SOW, Aon agreed, among other things, to "[r]eview insurance wording in leases," make "risk mitigation and other recommendations as needed," "provide day-to-day technical advice and consultation," "answer coverage questions," "[c]onduct policy wording analysis," "negotiate with carriers," "prepare policy summaries," "[h]andle daily *ad hoc* requests for policy documentation," and "[i]ssue Certificates of Insurance." The relationship was a nonexclusive one, with Sears retaining the right to engage other providers for these same services.

¶ 12    The second SOW attached to the complaint, labeled SOW #3, was effective from June 1, 2017, to October 31, 2019. In it, Aon agreed that its affiliate, Aon Risk Consultants, Inc. (AGRC), would assist Sears in identifying its exposure to loss, developing a strategic risk management plan, effectively resolving open claims, and, where appropriate, working with parties to reach settlement agreements. Specifically, AGRC agreed to "[r]eview insurance wording in leases *** and other legal documents to evaluate appropriateness of wording and assure compliance" and "provide leadership to [Sears's] risk management, and claims teams." In performing these services, AGRC would "follow the direction of [Sears's] Senior Management" and would "conform to the operating policies and procedures of [Sears]." SOW #3 further provided that the services AGRC would provide were "not of a legal nature"; that AGRC would "in no event give, or be required to give, any legal opinion"; and that Sears would "be responsible and have authority for all final determinations as to *** settlement of claims."

¶ 13    The third SOW attached to the complaint, SOW #5, was dated September 1, 2017, but bore handwritten notations and initials indicating it was actually agreed to on October 19, 2017. Under

SOW #5. Aon agreed to "perform Claim Preparation Services *** as a result of various hurricanes [Harvey, Irma, and Maria] and other events as requested by [Sears] during 2017." Aon agreed to "[a]ssist, prepare and provide details and analysis to be used by Sears to develop claim(s)"; provide "assistance to Sears in assessing, preparing, documenting and/or certifying details of its claim(s)"; "[p]repare and assist with final claim analyses and measurement of damages"; and "assist with responses to insurer's review and adjustment of damages."

¶ 14                              C. The Property Damage Policy

¶ 15    The "Contract of Insurance" Aon brokered for Sears for the period June 1, 2017, to June 1, 2018, established a property insurance program under which 20 different insurance carriers agreed to provide $440 million in coverage for "all risk of direct physical loss or damage" to Sears's properties worldwide. In the "Risk Details" section of the document, "Named Insured" or "Insured" was defined as Sears and its subsidiaries, as well as "any other party for which the Insured has the responsibility for providing insurance, as their respective interest may appear." The contract authorized Aon "to issue Certificate(s) of Insurance *** naming Additional Named Insured(s), Loss Payee(s) or Mortgagee(s), and others for their respective rights and interests." In the event of a loss, the insured was to file a detailed proof of loss with the insurer and the loss would be adjusted with the insured's risk management department. "[A]ll adjusted claims, including partial claims," were to be "paid to the Insured or its order within Thirty (30) days after reaching agreement on the value of the claim or any part thereof." And specifically, losses were to "be adjusted with and payable to Sears Holdings Corporation or as directed by it."

¶ 16                              D. Hurricane Maria and Its Aftermath

¶ 17    On September 20, 2017, Hurricane Maria struck Puerto Rico, causing over $20,000,000 in damage to the shopping mall. Santa Rosa attached to its complaint correspondence that its property

management company, Commercial Centers Management Realty (CCM), had with Sears, Aon, and the individual insurers in the hurricane's aftermath.

¶ 18    On October 23, 2017, CCM wrote to Sears, noting that a month had passed since the hurricane and no formal communication had been received from Sears about its plans for restoring the property. It reminded Sears that, under section 6.03 of the lease, it was required to deposit all insurance proceeds in a special account in Santa Rosa's name. Santa Rosa asked for a detailed schedule of anticipated restoration work, to "be kept informed of the status of the insurance claim," and for "any insurance proceeds [to be] deposited as required by the Lease Agreement."

¶ 19    On October 25, 2017, Aon e-mailed CCM, per CCM's request, a certificate of property insurance for the Puerto Rico store listing Sears as the insured but noting that Santa Rosa and CCM were "included as Loss Payee in accordance with the policy provisions."

¶ 20    On October 26, 2017, Sears wrote back to CCM to say that it was in the process of obtaining proposals for the work and "intend[ed] to repair the building on an expedited basis as material and labor [were] available" but that this might take a number of months. With respect to the insurance proceeds, Sears said:

> "We agree the Lease Agreement dated September 6th, 1965, requires the Tenant to repair the building for damage or destruction by fire or other insured casualty. Sears has an insurance claim for this loss but it will take some time for insurance proceeds to be received to [*sic*] this loss. Please let us know what account the Landlord would like the insurance proceeds to be deposited to for building repair. Once the insurance payment is received arrangements will be made for it to be deposited with an agreed bank."

¶ 21    On October 30, 2017, CCM wrote to one of the individual insurers, telling it that both Santa Rosa and CCM were "Additional Insureds under the policy" and enclosing a copy of the certificate

of insurance. CCM advised the insurer of the provision in Sears's lease requiring insurance proceeds to be deposited in a special account and stated that Sears was "aware and ha[d] agreed to fully comply with th[at] provision[ ] of the Lease." CCM asked to be kept informed regarding the filing and processing of claims under the policy and for any proceeds to be deposited as required by the lease.

¶ 22                              E. Sears Settles With the Insurers

¶ 23    On January 17, 2018, Sears reached a confidential settlement agreement with the individual insurers for claims related to both Hurricane Maria and Hurricane Irma (which had passed by Puerto Rico shortly before Hurricane Maria). The agreement stated that the insurers had already made or agreed to make payments to Sears totaling over $46 million and that they would pay an additional $13 million to settle all remaining disputes regarding coverage. Sears represented that it was "the only party of interest" under the policies and agreed to indemnify the insurers and defend them against any actions or claims made under the policies.

¶ 24                  F. Sears Changes Its Position and Files for Bankruptcy

¶ 25    In a June 1, 2018, letter to CCM, Sears reversed course. Upon review, it saw "no requirement for [it] to set up a special account in the Landlord's name with insurance proceeds if the Parent Corporation [was] the building insurer" under section 6.04 of the lease. Sears represented that it had in fact elected to self-insure the building and that it would continue its repair efforts but that "no special account [would] be set up to fund [those] repairs." Sears enclosed with its letter the latest status report detailing the repairs.

¶ 26    CCM wrote back several days later, on June 4, 2018, pointing out to Sears that its new position was contrary to the one it had taken in its October 26, 2017, letter and arguing that "the possibility of Sears being self-insured [was] defeated by the fact that an insurance policy [was] in

place." CCM asserted that section 6.03, not 6.04, of the lease applied and insisted that Sears was in default for failing to comply with the requirements of that section.

¶ 27 Sears doubled down on its new interpretation of the lease in a June 6, 2018, "recap" of its communications with Santa Rosa, reiterating its belief that under section 6.04 of the lease it was not required to place insurance money in a special account for building repairs. Sears believed it had been "proceeding in a diligent fashion" with the building repairs and attached a construction schedule proposing January 1, 2019, as a grand reopening date.

¶ 28 On October 15, 2018, Sears filed for Chapter 11 bankruptcy protection. Santa Rosa's attempts to recover from either Sears or its insurers have thus far been limited or thwarted by the bankruptcy proceedings. At the time of oral argument in this appeal, the mall had one general unsecured bankruptcy claim pending directly against Sears for $44 million, and its attempts to assert claims against Sears's insurers had been halted by the bankruptcy court's ruling that such claims would result in the insurers bringing indemnification claims against Sears, in violation of the automatic bankruptcy stay.

¶ 29                           G. Santa Rosa Reaches Out to Aon

¶ 30 On May 14, 2019, Santa Rosa wrote to share with Aon "for information purposes only," the "predicament that [it] face[d] on account of the omission of the insurers *** to acknowledge that [Santa Rosa was] among the named insureds under the policy, as evidenced by the certificate of insurance issued by Aon." While assuring Aon that its letter was "not a demand for payment," Santa Rosa stated that "[c]onsidering the significant role played by Aon and its numerous affiliates in the placement and administration of the above captioned insurance policies," Santa Rosa believed it was in the best interests of both Aon and the mall to discuss the matter.

¶ 31 Aon wrote back over a month and a half later, on July 2, 2019, to say that it had searched

its records and "had no record of a certificate being issued with Santa Rosa Mall as the certificate holder." It asked Santa Rosa to e-mail the certificate so that it could better assess the mall's position.

¶ 32   Later that month, on July 23, 2019, Santa Rosa's counsel received a letter from a lawyer for one of the insureds advising the mall that "the subject Policies contain clear and unambiguous provisions relative to the manner in which payment should be made in the event of a covered loss," that those provisions "expressly directed [the insurer] to make payment to [Sears] and to no other order," and that the insurer had accordingly "made payment consistent with [Sears]'s directives." To the extent Santa Rosa took exception with the manner or direction of payment, it was recommended that they "continue to assert [their] position and interests with [Sears]."

¶ 33   On April 6, 2020, Kelly Ross, Aon's senior litigation counsel, wrote to Santa Rosa's lawyer, assuring him that, while Aon understood the "unfortunate predicament" that Sears's bankruptcy presented to Santa Rosa, Aon's role "was limited." It was a broker, not an insurance carrier, and was not a party to Sears's lease with Santa Rosa. It had been contracted to provide insurance brokerage and administrative services, and the fact that it had issued a certificate of insurance to Santa Rosa did not, pursuant to an express disclaimer in the certificate, create a contractual relationship between Aon and Santa Rosa. Ms. Ross acknowledged that Aon was "separately hired by Sears to perform claim preparation services for properties impacted by various hurricanes" but noted that it was neither the adjuster for those claims nor involved in the distribution of proceeds. She concluded by reiterating: "your grievance is with Sears, not Aon."

¶ 34                    H. Santa Rosa's Complaint Against Aon

¶ 35   On November 5, 2021, Santa Rosa sued Aon for, among other things, professional negligence and tortious interference with contract. It alleged that Sears, which was experiencing

financial difficulties, had "concocted a scheme, with AON's assistance, to divert insurance recoveries that were supposed to be deposited into a separate account for Santa Rosa Mall's benefit so that the Shopping Center could be repaired." Santa Rosa alleged that on June 1, 2018, when Sears abruptly changed its position on the meaning of the lease language, "AON had been assisting Sears with all manner of insurance-related issues for more than six years," that the attached SOWs governing their relationship specifically stated that Aon would advise Sears regarding the insurance requirements in its lease agreements, and that Aon "knew that Santa Rosa Mall was a loss payee under the Property Damage Policy," both because it had drafted that policy and because it had issued certificates of insurance stating as much to Santa Rosa over the years.

¶ 36    Santa Rosa alleged that by June 2018 Sears was "running out the clock" until it could initiate bankruptcy proceedings, that it no longer intended to reopen the store, and that it instead "implement[ed] its scheme with AON's assistance" to keep the insurance proceeds for itself. Sears then proceeded, again "with AON's assistance," to "negotiate and ultimately to resolve and release all claims to hurricane-related coverage under the [policy]." According to Santa Rosa, Aon "worked with" Sears to "invent [this] alternate reality where Sears Holdings Corporation 'insured' the building at the Shopping Center" for the sole purpose of avoiding its obligations under the lease agreement.

¶ 37    Santa Rosa alleged that as a result of this scheme it had "not been indemnified for over $20 million in property damage losses caused by Hurricane Maria. It asserted that this was the result of Aon's failure "to protect the rights of [Santa Rosa] as an insured and/or loss payee under an insurance policy that was negotiated, drafted, placed, issued, serviced, and/or administered by Aon." According to it, Aon had a "duty to speak" and had breached its duty of care to Santa Rosa by "permitting" Sears to "abscond with the hurricane-related insurance recoveries."

¶ 38    In a 25-page opinion and order issued on April 25, 2022, the circuit court dismissed Santa Rosa's claim for professional negligence with prejudice, construing the policy language to provide that Santa Rosa was a loss payee and not an additional insured. The court also concluded that it was unreasonable to conclude "that Aon should have or could have foreseen that Sears would break the Lease, file for bankruptcy, reject the Lease in bankruptcy, settle with the Insurers, and refuse to pay [Santa Rosa] any proceeds." Even assuming that a duty was owed to Santa Rosa, the court said, Aon's instructions to the insurers to pay the insurance proceeds to Sears exactly as required by the policy could not be viewed as the breach of a professional duty.

¶ 39    The court dismissed the mall's claim for tortious interference with contract without prejudice. In an amended complaint filed on May 23, 2022, Santa Rosa alleged that in the years before Hurricane Maria struck, it had corresponded directly with Aon concerning the policy at issue here. Santa Rosa attached letters and e-mails from 2014 and 2016 showing that it had made clear to both Sears and Aon that it believed it was an additional insured under the policy and that from time to time it had requested and received certificates of insurance directly from Aon referring to it as a loss payee.

¶ 40    Santa Rosa also attached an April 3, 2019, proof of claim Aon filed as a creditor in the bankruptcy proceedings, in which it sought payment for work that three of its consultants did for Sears in July, August, and September 2018—the months immediately after Sears's June 2018 change of heart regarding its interpretation of the lease language—under the headings "Sears— Hurricane Maria" and "Maria Liability Damages." Santa Rosa alleged that "[f]urther insight into the precise nature of the services AON performed for Sears throughout 2018 would be contained in the billing entries that [it] should have the right to obtain via discovery." It asserted that the

"reasonable inference flowing from these documents," however, "which showed that Aon had been advising Sears about the insurance requirements in its leases for several years and was additionally advising it on Hurricane Maria recoveries," was "that AON was deeply involved in the decision of Sears to breach the Lease."

¶ 41    Aon again moved to dismiss the tortious interference claim under section 2-615 of the Code. It argued that Santa Rosa's additional allegations and attachments did nothing to fill the void the court had identified: the mall still had not alleged any specific facts showing that Aon played an active role in Sears's breach or had any power to prevent it.

¶ 42    The court agreed and dismissed the claim again, this time with prejudice. It rejected as improper Santa Rosa's request, made for the first time at argument on its motion for reconsideration, to amend its professional negligence claim.

¶ 43                             II. JURISDICTION

¶ 44    The circuit court dismissed with prejudice Santa Rosa's claim for professional negligence on April 25, 2022, and its claim for tortious interference with contract in a final order resolving all claims on August 22, 2022. Santa Rosa timely filed its notice of appeal on September 2, 2022. We have jurisdiction over this appeal pursuant to Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017), governing appeals from final judgments in civil cases.

¶ 45                             III. ANALYSIS

¶ 46    Santa Rosa appeals from the circuit court's orders dismissing its claims against Aon for professional negligence and tortious interference with prejudice under section 2-615 of the Code (735 ILCS 5/2-615 (West 2020)). "A section 2-615 motion to dismiss [citation] challenges the legal sufficiency of a complaint based on defects apparent on its face." *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). "The essential question presented is whether the allegations of

the complaint, taken as true and construed in the light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted." *Lintzeris v. City of Chicago*, 2023 IL 127547, ¶ 18.

¶ 47    Illinois is a fact-pleading jurisdiction. *Anderson v. Vanden Dorpel*, 2172 Ill. 2d 399, 408 (1996). A plaintiff must allege facts sufficient to support its claim and not "mere conclusions of law or fact unsupported by specific factual allegations." *Id.* A cause of action should not be dismissed pursuant to this section, however, "unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to recovery." (Internal quotation marks omitted.) *O'Connell v. County of Cook*, 2022 IL 127527, ¶ 18. Our review is *de novo. Alpha School Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 735 (2009).

¶ 48                          A. Professional Negligence

¶ 49    To state a claim for professional negligence, a plaintiff must allege "(1) the existence of a professional relationship, (2) a breach of duty arising from that relationship, (3) causation, and (4) damages." *MC Baldwin Financial Co. v. DiMaggio, Rosario & Veraja, LLC*, 364 Ill. App. 3d 6, 14 (2006). Here, the circuit court concluded that Santa Rosa had not—and could not—allege that Aon owed it any duty arising out of a professional relationship. Santa Rosa insists, however, that it sufficiently alleged Aon owed it a duty as an additional named insured under the policy and, alternatively, as a third party that Aon should have foreseen would be harmed. We address each argument in turn.

¶ 50                    1. Even as an Additional Insured, Santa Rosa

                        Would Be Owed No Duty by Sears's Broker

¶ 51    Santa Rosa argues that the policy—which defined an insured as any "party for which the Insured [Sears] has the responsibility for providing insurance"—and the lease—which required

Sears to maintain property damage insurance "for the benefit of" both Santa Rosa and Sears—must be read together to establish that Santa Rosa was an additional insured. Aon maintains, as the circuit court concluded, that the mall was only a loss payee under the policy. This can be a meaningful distinction where relief is sought from an insurer because, as this court noted in *Posner v. Firemen's Insurance Co.*, 49 Ill. App. 2d 209, 215-16 (1964), a loss payee is generally viewed as a mere appointee—a person or entity designated to receive money the insured is entitled to under the policy—and not as a party to the contract. The loss payee's rights in such cases are thus "of a derivative nature" and "dependent entirely upon the rights of the named insured." *Id.* at 216. If the named insured does something to forfeit its recovery under the policy, a loss payee will likewise be prevented from recovering. *Id.* In contrast, an additional insured has a separate contractual relationship with the insurer. *Id.*; see *Suburban, Inc. v. Cincinnati Insurance Co.*, 323 Ill. App. 3d 278, 282 (2001).

¶ 52    The cases Santa Rosa relies on do provide some support for its argument that it would be viewed as an additional insured under the policy. In *Kassis v. Ohio Casualty Insurance Co.*, 913 N.E.2d 933, 934 (N.Y. 2009), for example, a landlord was found to be an additional insured when his tenant agreed to maintain general liability insurance for their "mutual benefit." The court concluded that the landlord was thus a person whom the tenant had agreed in writing "to name as an additional insured" under the additional insured clause contained in the policy. *Id.* The circuit court rejected this case and others with little explanation. Aon attempts to distinguish them on the facts and, where that fails, urges us to disregard them as nonbinding authority.

¶ 53    The real basis for setting aside this line of cases, however, is that they involve claims against *insurers* who have an independent professional duty to all of their insureds—be they additional insureds or named insureds. See *Pekin Insurance Co. v. Home Insurance Co.*, 134 Ill.

App. 3d 31, 33 (noting that "[i]t is well established that an insurer has a duty to exercise good faith and to deal fairly with all parties insured by its policies"). As the documents attached to Santa Rosa's complaint make clear, Aon was not an insurer but an insurance broker. A broker serves as a middleman between the policyholder and the insurer to procure insurance for the policyholder. (Internal quotation marks omitted.) *Economy Fire & Casualty Co. v. Bassett*, 170 Ill. App. 3d 765, 771 (1988). The documents also make clear that Aon's client here was Sears, not Santa Rosa. Aon had a duty to procure property damage coverage for Sears's many properties that conformed with Sears's needs and instructions, it recruited insurance companies to provide that coverage, and it drafted the policy those parties would be bound by. But Aon itself was not a party to that contract of insurance, and thus Santa Rosa's status as an additional insured—if that is indeed what the mall was—would not give rise to a duty flowing from Aon to the mall. The cases Santa Rosa cites, which recognize that an insurer will owe duties to an additional insured, simply do not apply here.

¶ 54    Following argument in this appeal, the parties were given the opportunity to supplement their briefing with any authorities discussing whether a *broker*, as opposed to an insurer, has a duty to an additional insured. In its supplemental brief, Aon cites cases supporting this court's understanding that a broker generally owes no post-procurement duties to an additional insured. See, *e.g.*, *Arredondo v. City of New* York, 6 A.D.3d 328, 329 (N.Y. App. Div. 2004) (noting that "[i]t is well settled that the duty of an insurance broker runs to its customer and not to any additional insureds") and *St. George v. W.J. Barney Corp.*, 270 A.D. 171, 172 (N.Y. App. Div. 2000) (holding that while the insurance broker in that case might "arguably have breached its duty to its client," it could not be held liable to an additional insured, "to whom it owed no duty").

¶ 55    In its own supplemental brief, Santa Rosa cites cases standing for the proposition that a broker may owe duties to an intended insured to prevent harm from the foreseeable consequences

of the broker's own negligent conduct. This is a separate theory of liability based on the ordinary duty of care owed to a foreseeable third party that we address in detail below. Those cases provide no support for the proposition that a broker owes a professional duty of care to an additional insured that is not its client solely by virtue of that party's status as an additional insured.

¶ 56        2. Aon Owed No Duty to Santa Rosa as a Foreseeable Third Party

¶ 57    Citing the principle that "every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act" (internal quotation marks omitted) (*Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 19), Santa Rosa argues that Aon had a duty to protect Santa Rosa from foreseeable harm. This is a duty, the case law notes, that "does not depend upon contract, privity of interest or the proximity of relationship." (Internal quotation marks omitted.) *Id.* Santa Rosa initially relied primarily on *Cleveland Indians Baseball Co., L.P. v. New Hampshire Insurance Co.*, 727 F.3d 633, 639-40 (6th Cir. 2013), as support for this argument, and in its supplemental briefing after oral argument, Santa Rosa cites other cases that are similar to *Cleveland Indians.*

¶ 58    In *Cleveland Indians*, two spectators at a baseball game were seriously injured (and one died from his injuries) when an inflatable slide used for an event at the ballpark collapsed on them. *Id.* at 635. The event producer operating the slide was required by contract to purchase general liability insurance naming the baseball team as an additional insured and engaged an insurance broker to provide it with the necessary coverage. *Id.* Only after the incident occurred was it discovered that the broker had failed to procure a policy covering inflatables. *Id.* at 636. At summary judgment, the trial court concluded that the broker owed no duty to the baseball team that was separate and distinct from the duties it owed to the party it had contracted with. *Id.* 638. The appellate court disagreed. It was "reasonably foreseeable," it concluded, "that an additional

insured such as the [baseball team would] be harmed if an insurance agency or other intermediary fail[ed] to procure the intended coverage." *Id.* at 639.

¶ 59    The circuit court in this case concluded that *Cleveland Indians* was not applicable here because Santa Rosa was not an additional insured. We agree the case is not relevant, but for a different reason. The *Cleveland Indians* court recognized that "considerations of fairness, including the defendant's ability to prevent the harm, permit a finding that the defendant owes a duty of care to foreseeable third parties." *Id.* The court also recognized that "the law should not allow the insurance broker to be held liable to a virtually limitless class of claimants who are total strangers to the relationship" (*id*.) and found that the baseball team was not a total stranger because it had a "special relationship" by virtue of its status as an additional insured, something that made harm to the team clearly foreseeable to the agent procuring coverage. *Id*. 639-640. In our view, this specific foreseeability based on a special relationship would be equally clear regardless of whether the baseball team was an additional insured or a loss payee.

¶ 60    What distinguishes *Cleveland Indians* from this case is the fact that Santa Rosa has not alleged any failure by Aon of its duties *as an insurance broker*. Under Illinois law, a broker's essential duty is to procure adequate insurance, and he "is not liable if he acts in good faith and with reasonable care, skill, and diligence to place the insurance in compliance with his principal's instructions." *Economy Fire*, 170 Ill. App. 3d at 772. Santa Rosa's complaint contains no allegations concerning Aon's procurement of insurance. Rather the entirety of the complaint is about what Aon failed to do to alert Santa Rosa or to convince Sears to pay Santa Rosa after claims were made under the policy.

¶ 61    The cases Santa Rosa cites in its supplemental brief rest on the same theory of liability and are unhelpful for the same reason. The defendant in *Skaperdas v. Country Casualty Insurance Co.*,

2015 IL 117021, ¶¶ 3-4, an insurer, issued an automobile insurance policy naming only the plaintiff as an insured, although the plaintiff had specifically instructed the insurer's agent that his fiancée should be included as an additional named insured. *Id.* ¶¶ 3-4. The insured and his fiancée sued, alleging that the agent had breached his duty as an "insurance producer" under section 2-2201 of the Code of Civil Procedure (735 ILCS 5/2-2201) (West 2010)) to "exercise ordinary care and skill in renewing, procuring, binding, and placing the requested insurance coverage." (Internal quotation marks omitted.) *Id.* ¶ 6. The issue of first impression in that case was whether section 2-2201 applied to insurance agents, whose duties are generally owed to the companies they work for, or only to insurance brokers, who owe duties to the clients that hire them to procure insurance on their behalf. *Id.* ¶¶ 18-19. Our supreme court concluded that the section applied to either type of insurance professional because the duty it articulated was not based on a fiduciary or agency relationship but on the ordinary duty of care that every person owes to prevent harm where that person's actions have created a foreseeable risk of injury. *Id.* ¶¶ 25-26. Santa Rosa also cites several trial court decisions applying *Skaperdas* to find that a broker owes a duty of ordinary care to a proposed insured under such circumstances. See *Access Services of Northern Illinois v. Capitol Administrators, Inc.*, 522 F. Supp. 3d 446, 454-55 (N.D. Ill. 2021); *Moje v. Federal Hockey League LLC*, No. 15-CV-8929, 2017 WL 4005920, *2 (N.D. Ill. Sept. 12, 2017); *Kindra Lake Towing, L.P. v. Donat Insurance Services, LLC*, No. 16 C 3916, 2016 WL 5339438, *2, 5 (N.D. Ill. Sept. 20, 2016). Just like *Cleveland Indians*, these cases all involve broker liability to a third party for the foreseeable consequences of the broker's own failure to procure adequate insurance. That is simply not what Santa Rosa has alleged occurred here.

¶ 62     Nothing in *Cleveland Indians* or these other cases suggests that insurance brokers have a duty to protect third parties from foreseeable harm flowing from the conduct of their clients. And

to the extent that Santa Rosa alleges that Aon directed or encouraged *Sears* to breach its obligations under the lease, that would not be a claim of professional negligence but a claim of tortious interference. Santa Rosa asserted such a claim, and we consider it separately below.

¶ 63    Although Aon argues that it was improper for Santa Rosa to attempt to convert its motion for reconsideration of the court's dismissal of its professional negligence claim into an untimely request to amend that claim, it is clear to us that even if properly presented, the proposed amendment did nothing to cure the deficiencies identified above. See *Jessen v. Sverdrup & Parcel & Associates, Inc.*, 218 Ill. App. 3d 901, 904 (noting that "it is not an abuse of discretion to deny a motion for leave to amend when the proposed amendment would not cure the defect in the pleading"). Santa Rosa's vague insistence on appeal that its amendment "provide[d] a greater factual basis for [its] claims" while "not add[ing] any new legal theories," does nothing to convince us otherwise. The amended allegations, which further detailed the relationship between Sears and Aon, showed that Aon was aware of the particular lease at issue here, and revealed that Aon at one point sought payment for its services from the Sears bankruptcy, were clearly aimed at bolstering the mall's separate claim for tortious interference with contract. Santa Rosa has made no effort to explain how those allegations establish the existence of a duty (or the breach of such a duty) running from Aon, as Sears's broker, to Santa Rosa, a third-party who was not Aon's client.

¶ 64    Because we agree with the circuit court that Santa Rosa failed to allege that Aon owed it either a duty arising from a professional relationship or a duty to protect the mall from the foreseeable consequences of its own negligent conduct, we affirm the dismissal of its professional negligence claim.

¶ 65                          B. Tortious Interference With Contract

¶ 66    We next turn to Santa Rosa's claim for tortious interference with contract. When assessing

such claims, our supreme court has referred to section 766 of the Restatement (Second) of Torts (Restatement (Second) of Torts § 766 (1979)). See, *e.g.*, *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 513 (1991). That section provides:

> "One who intentionally and improperly interferes with the performance of a contract *** between another and a third person by inducing or otherwise causing the person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." Restatement (Second) of Torts § 766 (1979).

¶ 67 From this formulation of the tort, courts in Illinois have extracted the following elements: "(1) the existence of a valid and enforceable contract between the plaintiff and a third party, (2) that [the] defendant was aware of the contract, (3) that [the] defendant intentionally and unjustifiably induced a breach of the contract, (4) that the wrongful conduct of [the] defendant caused a subsequent breach of the contract by the third party, and (5) that the plaintiff was damaged as a result." (Internal quotation marks omitted.) *Bank Financial, FSB v. Brandwein*, 2015 IL App (1st) 143956, ¶ 43.

¶ 68 Aon does not dispute that Santa Rosa alleged the lease agreement between it and Sears was valid and enforceable, that Aon was aware of that lease, or that Santa Rosa was damaged when Sears breached its duties under the lease. Its argument is that Santa Rosa "did not and cannot" allege that Aon intentionally and without justification induced Sears to breach the lease or that its wrongful conduct was a cause of the breach.

¶ 69 Santa Rosa has repeatedly alleged that Sears "worked with" and "assisted" Sears with its scheme to deprive the mall of the insurance proceeds it was entitled to under the lease. These phrasings suggest a level of involvement somewhere below that of inducement. The word "induce"

means both to lead or move by persuasion or influence, as to some action or state of mind and to bring about, produce, or cause. See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/induce (last visited June 21, 2023) [https://perma.cc/6XGV-EK4J]. Comment h to section 766 of the Restatement further states that the word "refers to the situations in which A causes B to choose one course of conduct rather than another," whether "by persuasion or by intimidation." Restatement (Second) of Torts § 766 cmt. h (1979). These definitions make it clear that a purported tortfeasor must instigate, and not merely be a participant in or have knowledge of, a breach.

¶ 70    Santa Rosa has also alleged that, under SOW #3, which was in effect from June 1, 2017, through October 31, 2019, Aon contracted with Sears to undertake a whole host of Sears's risk management functions, including the review of "insurance wording in leases" to "assure compliance" and, "where appropriate, working with parties to reach settlement agreements." The involvement was extensive enough to be described in the SOW as "provid[ing] leadership to [Sears's] risk management, and claims teams." Aon argues that the SOWs merely described services Aon *could* provide to Sears, not ones that it necessarily did provide. But at this stage we must admit not just all well-pled facts but any reasonable inferences to be drawn from those facts. *Penner v. Frisch*, 57 Ill. App. 3d 947 (1978). Here, it is reasonable to assume that Aon actually performed the services it was hired to perform.

¶ 71    Nevertheless, all that can reasonably be gleaned from a liberal reading of this agreement is that Aon had the *opportunity* to induce Sears to breach the lease during the timeframe in which Sears changed its interpretation of the lease requirements. There is simply no allegation of fact suggesting that Aon in fact did so. Nor is the timing of any of the SOWs sufficient to raise an inference that Aon was responsible for Sears's change in position. SOW #3, for example, was in

effect both on October 26, 2017, when Sears committed to Santa Rosa that it would deposit the insurance proceeds in a separate account to fund repairs to the mall *and* in June of 2018 when it reversed course.

¶ 72    SOW #5, also relied on by Santa Rosa, is also unhelpful. Under that agreement, Aon was to assist Sears with claim preparation. While this certainly suggests Aon was involved in helping Sears recover from the insurers, it provides no support for an inference that Aon convinced or induced Sears to change its view of what the lease required. This SOW was agreed to on October 19, 2017, but made retroactive to September 1, 2017. So, it too would have been in place both on October 26, 2017, when Sears agreed with Santa Rosa that the lease required it to deposit insurance proceeds in a separate account for repairs to the mall, and in June 2018, when Sears flatly denied that it had any obligation to do so. Nothing about the substance or timing of these SOWs demonstrates that Sears's increased involvement with Aon was responsible for Sears's changed position.

¶ 73    Santa Rosa does allege, in a purely conclusory fashion, that Aon "induced Sears to breach the Lease," but such allegations are plainly insufficient. Although the Code provides that "[n]o pleading is bad in substance which contains such information as reasonably informs the opposite party of the nature of the claim or defense which he or she is called upon to meet" (735 ILCS 5/2-612 (West 2020)), our supreme court has made clear that this does not authorize notice pleading (*Edelman, Combs & Latturner v. Hinshaw & Culbertson*, 338 Ill. App. 3d 156, 167 (2003) (citing *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 426-27 (1981))). Illinois remains a fact-pleading jurisdiction, and conclusory allegations alone are thus insufficient to state a cause of action. *Doe v. Coe*, 2019 IL 123521, ¶ 32. Instead, enough facts must be alleged "to bring a claim within a legally recognized cause of action." (Internal quotation marks omitted.) *City of Chicago v. Beretta*

*U.S.A. Corp.*, 213 Ill. 2d 351, 368 (2004). Santa Rosa has simply not done that here.

In sum, where Santa Rosa has alleged that Aon induced Sears to breach its lease, it has done so only in a conclusory fashion that does not satisfy our state's fact-pleading requirements. And where it has alleged concrete facts, the most that can reasonably be inferred from those facts is that Aon was in a position where it could have had the opportunity to suggest to Sears that it take a different position on its obligations under the lease. Equally consistent with the allegations, however, are scenarios in which Aon was a mere observer of or even unaware of Sears' change in position. This is not enough for the mall to move forward on a claim of tortious interference with contract against Aon.

¶ 74                                      IV. CONCLUSION

¶ 75    For all of the above reasons, we affirm the circuit court's dismissal with prejudice of Santa Rosa's claims against Aon for professional negligence and tortious interference with contract.

¶ 76    Affirmed.

**Santa Rosa Mall, LLC v. Aon Risk Services Central, Inc., 2023 IL App (1st) 221352**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2021-L-010841, the Hon. Michael F. Otto, Judge presiding. |
| **Attorneys for Appellant:** | Scott T. Schutte, Andrew J. Enschedé, and Staci M. Holthus, of Morgan, Lewis & Bockius LLP, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Jeffrey A. Soble, of Foley & Lardner LLP, of Chicago, for appellee. |